**Gary PEEPLES, Plaintiff**

v.

**COASTAL OFFICE PRODUCTS, INC., Defendant**

**No. CIV. AMD 01–1241.**

United States District Court, D. Maryland.

May 23, 2002.

Paul Francis Evelius, Wright Constable and Skeen LLP, Baltimore, MD, for Plaintiff.

Randi Klein Hyatt, Shawe and Rosenthal, Darrell R. VanDeusen, Kollman and Saucier PA, Laura L. Hoppenstein, Law Office, Baltimore, MD, for Defendant.

## MEMORANDUM

DAVIS, District Judge.

Plaintiff, Gary Peeples, instituted this case pursuant to the Family and Medical Leave Act of 1993, 29 U.S.C. §§ 2601 *et seq.* ("FMLA"), and the Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12101 *et seq.* ("ADA"), against his former employer, Coastal Office Products, Incorporated. Now pending are the parties' cross-motions for summary judgment and Peeples's motion for recusal.[1] The

---

1. The motion for recusal was filed under the following circumstances.

Upon my initial review of the cross-motions for summary judgment and the supporting memoranda, it became immediately apparent that (1) as the party with the burden of proof, plaintiff's motion for summary judgment was plainly not well-taken; (2) the failure-to-accommodate and retaliation claims asserted pursuant to the ADA failed as a matter of law; and (3) a bare scintilla of evidence could be said to support the FMLA claim.

The conclusion that the FMLA claim should survive summary judgment rested in significant part on my erroneous belief, created by plaintiff's representation in his memorandum in opposition to the defendant's motion for summary judgment, that the plaintiff's diagnosis of depression, which was rendered by hospital emergency room personnel on the day he abruptly left the workplace, never to return, had been faxed to plaintiff's supervisor on the next business day after plaintiff commenced his leave. (In fact, as discussed *infra* in text, plaintiff and his primary care physician *never* advised defendant of plaintiff's diagnosis of clinical depression or of his prognosis, and specifically, plaintiff did not fax the emergency room discharge instructions, which included the diagnosis of depression, to his supervisor on March 13, 2000, as I thought.) Moreover, there is *overwhelming* evidence in this record, including the plaintiff's own testimony that he believed defendant terminated his employment on the basis of a sincere belief that plaintiff would not or could not return to work at Coastal, of defendant's good faith belief in the lawfulness of its termination of plaintiff's employment.

Consequently, on March 18, 2002, I wrote to counsel setting a June 2002 trial date and an April 2002 pre-trial conference. I also stated to counsel in that same memorandum, in the naive belief that I might foster a settlement of the case by reflecting on my perception of its lack of merit (counsel had requested, and I had allowed, a suspension of the briefing schedule on dispositive motions to permit the parties to continue settlement discussions), that "I believe it is highly likely, indeed, a virtual certainty, that I will grant a motion for judgment at the close of the plaintiff's case." I noted that summary judgment was being withheld on the FMLA "claim(s)" because "the 'he said, she said' nature of the factual record ..., coupled with the plenitude of ambiguous medical records amassed by plaintiff ... render summary judgment on the FMLA claim inappropriate." In addition, I candidly stated that "I agree with defendant that the plaintiff's affidavit is an embarrassment, but that must be laid at the feet of counsel and not used to penalize plaintiff himself." (The description of plaintiff's affidavit as an "embarrassment" was based on the remarkably sloppy drafting of the plaintiff's affidavit, in which the plaintiff, who generally refers to himself therein in the first person, is made to refer to himself in several paragraphs in the third person, obviously as a result of the failure of plaintiff's counsel carefully to differentiate the use of language in the affidavit from the identical language appearing in the memorandum in support of plaintiff's cross-motion for summary judgment and in opposition to defendant's motion for summary judgment. *See, e.g., Affidavit of Plaintiff,* Exh. 31, at ¶¶ 3 ("The Manager job required *plaintiff* ...."); 4 ("During the time period from *my* promotion ... no one ever indicated to *me* that *he* was not performing *his* duties ...."); 11 ("Ziskind ... asked *me* if *his* illness was something from which *he* could recover ...."); 18 ("*I* never stated that *he* had any second thoughts about the manager position ...."; "*I* never expected ... that Ziskind would do *my* job for *him.*")(emphases added).)

Plaintiff (or plaintiff's counsel) took great umbrage at my candid assessment of the merits of the case and notified me in the proposed pretrial order (which was submitted in advance of the scheduled pretrial conference in accordance with the court's local rules) that a motion for recusal would be filed in advance of the pretrial conference. Indeed, plaintiff did so, asserting that I had improperly "prejudged" the case, that plaintiff would not receive a fair trial and/or, of equal importance, would not feel that he had received a fair trial even if he did receive a fair trial, and arguing that I should transfer the case to another judge for trial pursuant to 28 U.S.C. § 455. Plaintiff also pointed out, correctly, that as the standards for summary judgment and for judgment as a matter of law were precisely the same, *see, e.g., Dennis v. Columbia Colleton Medical Center, Inc.,* —— F.3d ——, —— (4th Cir.2002) ("A Rule 50(b) motion for judgment as a matter of law follows the same standard as a Rule 56 motion for summary judgment."), a contradiction inhered in my prediction that a motion for judgment would likely be granted in respect to the FMLA claim, in the face of a contemporaneous denial of summary judgment.

A further review of the dispositive motions prompted by the motion for recusal, clarified that, indeed, as discussed *infra* in text, plaintiff failed to trigger defendant's duties under the FMLA because plaintiff failed to provide adequate and timely notice of the need for FMLA leave, and therefore, summary judgment should indeed be granted to defendant on that claim as well, as there is no genuine dispute of material fact.

I take very seriously motions for recusal, as every federal judge must. In almost seven

parties' contentions are fully set forth and supported in the memoranda and exhibits accompanying their motions and no oral hearing is required. As explained herein, Peeples's FMLA claim fails because he did not provide adequate and timely notice to defendant of his need for, and the likely duration of, sick leave, as required by Department of Labor regulations implementing the statute; therefore, he did not trigger defendant's obligations and duties under the FMLA, and the termination of his employment was not violative of the FMLA. Peeples's ADA failure-to-accommodate and retaliation claims fail because, as a matter of law: (1) Peeples was not actually disabled within the ADA; (2) no reasonable juror could reasonably find by a preponderance of the evidence that he was "regarded as" disabled by defendant; and, (3) no reasonable juror could reasonably find by a preponderance of the evidence that the termination of his employment was proximately caused by Peeples's "invocation" of his rights under the ADA. Accordingly, Peeples's motions shall be denied and defendant's motion shall be granted.

## I.

Pursuant to Fed.R.Civ.P. 56(c), summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 247,

106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A fact is material for purposes of summary judgment, if when applied to the substantive law, it affects the outcome of the litigation. *Id.* at 248, 106 S.Ct. 2505. Summary judgment is also appropriate when a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

A party opposing a properly supported motion for summary judgment bears the burden of establishing the existence of a genuine issue of material fact. *Anderson,* 477 U.S. at 248–49, 106 S.Ct. 2505. "When a motion for summary judgment is made and supported as provided in [Rule 56], an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavit or as otherwise provided in [Rule 56] must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); *see Celotex Corp.,* 477 U.S. at 324, 106 S.Ct. 2548; *Anderson,* 477 U.S. at 252, 106 S.Ct. 2505; *Shealy v. Winston,* 929 F.2d 1009, 1012 (4th Cir.1991). Of course, the facts, as well as justifiable inferences to be drawn therefrom, must be viewed in the light most favorable to the nonmoving party. *Matsushita Elec. Indust. Co v. Zenith Radio Corp.,* 475 U.S. 574, 587–88, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The court, however, has an affirmative obligation to

years on this bench, and in the eight years before that on the state bench, this is to my recollection only the third non-frivolous one I have had occasion to review. Having fully reflected on the matter, I am satisfied that, a reasonable person fully informed of the factual and procedural circumstances which gave rise to plaintiff's decision to file his motion for recusal in this instance would not reasonably

conclude that I harbored a bias against plaintiff arising from an extra judicial source such as to call in to question the appearance of propriety in my presiding over this case. *See In re Beard,* 811 F.2d 818, 827 (4th Cir.1987). Accordingly, the motion for recusal shall be denied and summary judgment entered in favor of defendant for the reasons stated in this opinion.

prevent factually unsupported claims and defenses from proceeding to trial. *Felty v. Graves–Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir.1987).

## II.

I shall set forth the evidence in the light most favorable to Peeples.

Coastal provides professional services in connection with, and maintains and repairs, computer hardware and software for a variety of businesses and individuals. *Aff. of Harold Clasing* ¶ 3. Coastal was incorporated in 1987 by Bruce and Harold Clasing, who operate the company as President and Chief Operating Officer ("COO"), respectively. *Id.* ¶ 2. At all times relevant to this matter, defendant's Human Resources Director was Kimberly Hock ("Hock"), *Aff. of Kimberly Hock* ¶ 3, and Peeples's immediate supervisor was Matt Ziskind ("Ziskind"). *Aff. of Matt Ziskind* ¶ 2.

As a small company with an expanding client base, defendant did not employ 50 people, and thereby come within the ambit of some of the federal anti-discrimination statutes, until 1999. *Aff. of Harold Clasing* ¶ 4. Defendant displays the required notices of employee rights in its workplace, including an FMLA poster and an EEO poster. The EEO poster describes employee rights under the ADA. *Def.'s Ex.* 6 (EEO/FMLA posters). At all times relevant to this matter, these notices were located in a well-traveled common area of the office. *Aff. of Kimberly Hock* ¶ 4. Although Peeples claimed he had no recollection of the FMLA poster, he did recall that various employee notices regarding "wage and hours" were posted by the company. *Dep. of Peeples* at 81.

Peeples began his employment with Coastal as a service technician in April 1995. *Dep. of Peeples* at 73. Ziskind was then the Hardware Services Manager. *Id.*

at 74. Hardware Services is defendant's largest and busiest department. The Hardware Services Manager supervises service technicians and coordinates daily "crisis" calls from customers who are having computer problems. *Aff. of Matt Ziskind* ¶ 3. Ziskind held this position for a number of years. It is not disputed that the stress attending the position of Hardware Services Manager is extremely high. *Id.*

As a service technician, Peeples would visit customers to repair computers and printers. *Dep. of Peeples* at 73. Over the years, Peeples had received highly favorable performance evaluations from Ziskind, *Def.'s Ex.* 7 (Peeples's Performance Evaluations, most categories rated "excellent" and the remainder "above average"), and there is no evidence in the record that their relationship was anything other than entirely positive. In August 1999, Peeples was promoted to Hardware Technician/Assistant to the Manager of Hardware Services. *Dep. of Peeples* at 74; *Def.'s Ex.* 8 (Promotion Letter to Peeples, dated August 19, 1999). Thereafter, in late January 2000, Ziskind was promoted to Director of the Service Department, and Peeples applied for the job of Hardware Services Manager. *Dep. of Peeples* at 87. Following interviews with Ziskind and Bruce Clasing, Peeples was offered and accepted the job. *Id.; Def.'s Ex.* 9 (Promotion Letter to Peeples, dated January 27, 2000).

Peeples's promotion involved a substantial pay increase. Peeples fully understood, as defendant wrote in appointing him as Hardware Services Manager, "it is anticipated that the duties of [Hardware Services Manager] . . . extend beyond the normal 40-hour work week." *Def.'s Ex.* 9. The duties of the position included "assistance in strategic planning for the hardware services department, overall management of the hardware services department,

product evaluation, responsibility for profitability of hardware services department, maintaining ... service authorizations, hiring/training employees," *id.*, as well as "supervising six to eight employees; disciplining employees, preparing employee job evaluations; arranging and conducting team meetings for subordinates; approving employees' time sheets, leave requests, and expense reports; resolving customer complaints; and addressing warranty-related issues." *Aff. of Peeples* ¶ 3. Peeples was fully aware of the demands of his new job; Peeples had witnessed Ziskind in the position and he knew the job would be stressful and would require more than 40 hours a week to carry out his responsibilities. However, at the time he assumed the position, he did not anticipate that he would have any difficulty handling these requirements. *Dep. of Peeples* at 88, 90–91.

Sadly, Peeples quickly discovered that he could not handle the severe stress the job entailed. Specifically, soon after Peeples started work in the new position during the first week of February 2000, he found that he was unable to keep up with his workload. *Id.* at 92. He sought advice from Ziskind, who told him, perhaps unhelpfully, to "tackle one task at a time and, you know, not try to do everything at once." *Id.* Peeples's incessant feelings that he was overwhelmed by his duties did not abate. *Id.* Peeples again complained to Ziskind about his workload and asked him for advice. *Id.* When Ziskind explained that Peeples was expected to do the job that he was appointed to do, Peeples felt "betrayed" as Ziskind was not giving him the type of support that Peeples felt he was told he would receive. *Id.* at 92–93.[2] (Ziskind was busy handling the obligations of his new position, and while he was willing to give Peeples direction, he did not intend to do the job for him. *Aff. of Matt Ziskind* ¶ 4.)

Peeples confessed on deposition that it was possible that working longer hours would have helped him to gain a better grasp of his new position and to better handle his workload. Nevertheless, he thought that the nine-hour days that he was working should have been sufficient. *Dep. of Peeples* at 94–97. Peeples was simply unwilling to work longer hours. *Id.*

On the morning of March 10, 2000, Harold Clasing spoke to Peeples about a client matter. During this conversation, Peeples also discussed his job situation. Although defendant describes Peeples's assertions during this conversation as "complaints" about his workload, while Peeples characterizes his assertions as "simply asking Clasing for the advice and support that had been promised [him]," *Aff. of Peeples* ¶ 21, this is merely one of many *immaterial* disputes of fact on which Peeples seeks to rely to avoid summary judgment.[3] What is not disputed is that Clasing responded to Peeples as follows: "[W]hen you're in management, you need to work additional hours." *Dep. of Peeples* at 93. Although, as discussed *infra*, Peeples takes patently contradictory positions on the issue of whether he wanted to relinquish the manager position, his deposition testimony makes clear that he felt (without any justification apparent in the record) if he admitted to defendant that the manager

---

**2.** Peeples contends that although Ziskind had two assistant mangers when he was Manager of Hardware Services, defendant allowed Peeples to have only one assistant manager. There is no evidence that Peeples ever made this contention during his employment.

**3.** *See Hooven–Lewis v. Caldera,* 249 F.3d 259, 265 (4th Cir.2001) ("Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.").

position was too much for him, he did not believe, on March 10, 2000, he had the option of returning to his former position, even though the position had not been filled (this was, after all, one of Peeples's complaints, that he had only one assistant manager). *Id.* at 98. In any event, when Peeples returned from lunch on March 10, 2000, he told Ziskind that he was "sick" (or, as Peeples contends more specifically, that he was experiencing light-headedness and chest pains) and that he was going home. *Id.* Ziskind responded that his leaving was "okay" and thus Peeples left for the day. *Id.; Aff. of Matt Ziskind* ¶ 5. Peeples attests that he was experiencing light-headedness, anxiety, chest pains, and feelings of depression, and he refers to this March 10, 2000, episode as a "breakdown," *Aff. of Peeples* ¶¶ 5, 16, although none of his medical doctors use this term to describe their assessment of the March 10, 2000, episode.

On his way home from work, Peeples contemplated running his car off the road "as a means of getting time off of work." *Dep. of Peeples* at 99. In other words, as he admitted on deposition, Peeples thought of running his car off the road as a method of obtaining sick leave. *Id.* at 108. When he got home, Peeples was emotionally overwrought; he began to cry and shake uncontrollably out of concern for his job and the work that he was required to do. *Id.*

(Coincidentally, just a few weeks before March 10, 2000, defendant had announced a generous sick leave policy. The policy provided employees with up to three months leave at full salary if they could not come to work due to a legitimate medical condition. *Def.'s* Ex. 10 (Sick Leave Policy Announcement, March 2000). An employee who took sick leave was required to cooperate with defendant to ensure that defendant was supplied with medical confirmation that the employee had a "verifiable medical condition or short-term disability" and would be able to return to work. *Aff. of Harold Clasing* ¶ 5.)

Peeples's primary care physician is Dr. Randi Braman. Peeples had been seeing Dr. Braman for five years, and most recently, in particular, for sleep apnea. *Dep. of Peeples* at 101–03. Peeples does not contend that his sleep problems are at issue in this case. *Id.* at 103–04. On March 6, 2000, four days before he left work because he felt ill, Peeples had seen Dr. Braman for complaints of trouble sleeping and "ringing in ears." *Def.'s* Ex. 11 (Dr. Braman's Medical Notes, March 6, 2000). She had prescribed Zoloft, an antidepressant, in lieu of Ritalin, which he had been taking. *Aff. of Dr. Randi Braman* ¶ 4; *Def.'s* Ex. 11. She had been concerned that Peeples was showing signs of depression. *Id.* Nevertheless, according to Dr. Braman's notes from March 6, 2000, on that date Peeples had no depressive symptoms except "irritability with stress at work," and he had no problems with concentration, appetite, or emotional stability. *Def.'s* Ex. 11.

When Peeples arrived home early from work on March 10, 2000, he called Dr. Braman. When Peeples told her that he had considered running his car off the road, she ordered him to go immediately to a hospital emergency room, *Dep. of Peeples* at 100, based on her perception of his "suicidal ideation," notwithstanding that he also stated that "he had no plans to harm himself." *Aff. of Dr. Randi Braman* ¶ 5.

Peeples went immediately to the emergency room at Carroll County General Hospital. The psychiatric staff on duty (one of whom apparently spoke by telephone with Dr. Braman while Peeples was at the hospital) diagnosed Peeples with "depression DO NOS," i.e., "Depressive Disorder, Not Otherwise Specified."

*Def.'s Ex.* 13 (Carroll County General Hospital Medical Records). Essentially, this diagnosis means that while Peeples presented symptoms of being depressed, the doctor could not conclude "whether it is primary, due to a general medical condition or substance induced." *Def.'s* Ex/12 (DSM–IV–TR 311 Criteria). The doctor and a psychiatric nurse practitioner who saw Peeples both noted that he smokes marijuana (apparently twice a week), something which Peeples confirmed in his deposition. *Def.'s* Ex. 13; *Pl.'s* Ex. 33 (Psychiatric Treatment Notes of March 23, 2000); *Dep. of Peeples* at 111.

Peeples was not admitted to the hospital. He was instructed to follow up with his primary care physician and that he should not return to work for a week. The strength of his Zoloft prescription was increased, and he was to begin taking Trazodone, another anti-depressant. *Id.* The following Monday, March 13, 2000, Peeples called Ziskind and told him that he was sick and was unable to come to work. Peeples told Ziskind that he was hoping to return to work, but that he "could not guarantee anything" and he would not have firm information before he met with Dr. Braman on March 17, 2000. *Id.* at 113–14. During this conversation, Peeples does not recall mentioning any diagnosis or medical condition of any type, except his inability to stop shaking. *Id.* at 126–27. According to Peeples, Ziskind responded to him as follows: "What's the matter, can't you cut it?" *Id.* Ziskind recalls that Peeples told him that he was sick and could not return to work before he saw his doctor later that week. Ziskind told Peeples to send in a doctor's note, which Peeples did. *Aff. of Matt Ziskind* ¶ 6. The work excuse (from the emergency room) simply states that Peeples's return date was to be determined by his primary care physician, but that as for "restrictions," Peeples had "none." *Def.'s* Ex. 14 (Work Excuse, March 10, 2000). Although Peeples's discharge instructions contained more information, he did not fax that document to Ziskind.[4]

On March 17, 2000, Peeples saw Dr. Braman in her office. According to Dr. Braman's notes, Peeples was still "very anxious and paranoid." *Def.'s* Ex. 16. Peeples allegedly expressed to her a desire to go back to work within three days, but he was uncertain as to whether he could handle the stress of his job. *Id.* Dr. Braman decided that Peeples was unable to

4. As mentioned *supra* n. 1, and as discussed in text *infra*, Peeples's summary judgment memorandum erroneously contends that Peeples faxed the discharge instructions he received upon leaving the hospital on March 10, 2000, to Ziskind on the next business day after he departed the workplace on March 10, 2000, that is, March 13, 2000. The discharge instructions contained, *inter alia*, a preliminary diagnosis ("Depressive DO NOS") and confirmation that the visit was for a "psychiatric consultation." Plainly, however, Peeples *did not* fax the discharge instructions, and defendant was essentially kept in the dark as to Peeples's true medical diagnosis and prognosis up through and beyond the day his employment was terminated, namely, April 5, 2000. In addition to the record evidence cited in text, Peeples's intentional failure to fax the discharge instructions, contrary to his counsel's arguments here, is borne out by comparing the differences between the two versions of the work excuse in the record. The copy of the work excuse retained by the hospital is a part of the very same one-page document on which there appears the discharge instructions. *See* Carroll County General Hospital records dated March 10, 2000, contained as attachments to *Pl.'s* Ex. 32 (*Aff. of Dr. Randi Braman* ). On the other hand, the copy of the work excuse which Peeples faxed to Ziskind on March 13, 2000, *Def.'s* Ex. 14, has clearly been cut off or copied from that larger document. *See also* Proposed Pre-trial Order at ¶ 6 (Stipulation that *Def.'s* Ex. 14 is the document Peeples faxed to Ziskind on March 13, 2000.).

return to work until after he was evaluated, once again, on March 27, 2000. *Id.* Dr. Braman also increased his dosage of Zoloft. That same day, Dr. Braman faxed Ziskind a "Sick Slip" on behalf of Peeples that stated that Peeples "needs follow-up appointments [and] medication adjustment—not yet ready to resume work." *Def.'s* Ex. 15 (Sick Slip, March 17, 2000). Peeples then spoke to Ziskind that same day, telling him that he needed time off and his medication needed adjustment. Peeples does not recall explaining anything further, *Dep. of Peeples* at 156–57, and the record is clear that in fact he did not offer Ziskind any further explanation of his circumstances.

On Wednesday, March 22, 2000, Peeples had been off work for ten days and Ziskind, who had been covering Peeples's responsibilities, spoke to him and inquired as to how he was doing. *Aff. of Matt Ziskind* ¶ 8. Peeples told Ziskind that his status was unclear and he would not have further information before he saw another doctor. *Id.* Specifically, although Peeples knew on March 22, 2000, that he had an appointment to see a psychiatrist the next day (March 23, 2000) upon the referral of Dr. Braman, he told Ziskind that he "wouldn't know [when he might return to work] until I go see the thyroid doctor . . . ." *Dep. of Peeples* at 125.

(Although unrelated to his absence from work, Peeples had been referred to an endocrinologist by Dr. Braman, despite the fact that Peeples had learned *as early as March 18, 2000*, that his tests for thyroid malfunction had essentially been within normal limits. Peeples had a precautionary office visit on April 4, 2000, during which the endocrinologist elected to rerun certain tests. Those tests, and a further reevaluation on May 30, 2000, reconfirmed what was already known, namely, that Peeples had normal thyroid function. *Def.'s* Ex. 17, (Endocrinologist Notes, April 4, 2000 and May 30, 2000).)

In the meantime, as mentioned above, on Dr. Braman's referral, Peeples consulted a psychiatrist, Dr. Eduardo de la Cruz, on March 23, 2000. *Def.'s* Ex. 18 (Dr. de la Cruz's Medical Notes, March 23, 2000). Dr. de la Cruz concluded, after a psychiatric evaluation of Peeples, that Peeples had suffered from "a single episode" of "major depression" having "moderate severity." *Id.* He remarked that Peeples had likely been suffering from subclinical or prodronal symptoms, e.g., difficulty sleeping, lack of energy, and feelings of unhappiness, for about two years. *Id.* He concluded further that Peeples's recent symptoms were triggered by the pressures of his new position at work. *Id.* Dr. de la Cruz prescribed that Peeples should stay on Zoloft, increase his Trazodone dose, and take sick leave for "about two [to] three weeks." *Id.* (Dr. de la Cruz's notes do not make clear whether Dr. de la Cruz believed that the "two [to] three weeks" off work should run from March 10, 2000, the day of Peeples's "breakdown," or from March 23, 2000, the day of Peeples's visit with Dr. de la Cruz; in Dr. de la Cruz's affidavit, *Pl.'s* Ex. 33, he asserts that it was his intention that the three weeks should commence from March 23, 2000.) Peeples believed that Dr. de la Cruz's instructions meant that he was entitled to two or three weeks leave counting from the date of his visit with Dr. de la Cruz, because this would provide time for the medication to work. (Dr. de la Cruz had increased his dosage of Trazodone.) *Dep. of Peeples* at 121–22. As detailed *infra*, no one at Coastal ever learned that Dr. de la Cruz was treating Peeples for major depression at any time before this litigation began.

On Monday, March 27, 2000, Peeples again visited Dr. Braman; she determined that Peeples should remain off work until

at least April 12, 2000, when she would again reevaluate Peeples. *Aff. of Dr. Randi Braman* ¶ 8. Dr. Braman provided Peeples with a sick slip, which was faxed to defendant, and which stated, without further explanation, that Peeples "may not return to work until reevaluation on April 12, 2000." *Def.'s* Ex. 19 (Sick Slip from Dr. Braman, March 27, 2000); *Aff. of Peeples* ¶ 12.

Ziskind spoke to Peeples after he received the sick slip. During this conversation, Peeples told Ziskind he needed two to three weeks off from work. *Dep. of Peeples* at 158. Peeples claims a lack of recollection as to whether he told Ziskind that he was unable to return to work just yet due to depression and anxiety. At this point, Peeples had been off work from March 10, 2000, through March 27, 2000, and he had provided virtually no information about his circumstances; Ziskind was concerned. From Ziskind's perspective, if Peeples needed the remainder of his third week off, Ziskind would continue "to pick up the slack in his absence and continue to perform" Ziskind's own work, as well. *Aff. of Matt Ziskind* ¶ 9. However, if Peeples was going to be absent longer, Ziskind would need to find alternative coverage for Peeples's position. *Id.* As a result of this uncertainty, Ziskind consulted Hock, the Director of Human Resources. *Id.* ¶ 10. Hock then decided to contact Peeples "to get some understanding of the situation." *Aff. of Kimberly Hock* ¶ 5.

On Thursday, March 30, 2000, Hock spoke to Peeples by telephone to determine whether he would be able to attend the annual staff meeting that afternoon. *Id.* ¶ 6. Peeples stated that he would not attend. *Id.* Hock asked Peeples the extent of his restrictions, and whether he could do other work for defendant such as painting its new building next door. *Dep. of Peeples* at 44. Peeples told Hock that he did not know when he would be able to return to work, that he would know more after meeting Dr. Braman in two weeks (on April 12, 2000), *Aff. of Kimberly Hock* ¶ 6, and that he could do nothing related to his job; indeed, he could not even drive long distances, i.e., he could not drive to the workplace from his home. *Def.'s* Ex. 20 (Hock's Notes of Conversation with Peeples, March 30, 2000). According to Hock, Peeples also stated that he was "leaning toward" not being a manager, *Aff. of Kimberly Hock* ¶ 6. Although in his post deposition affidavit Peeples denies that he made such a statement to Hock, *Aff. of Peeples* ¶ 23, in his deposition, Peeples plainly and unequivocally admitted that he had made the statement attributed to him, i.e., that he was "leaning toward not to return as the manager." *Peeples's Dep.* at 163.[5]

Hock told Peeples "that the company had to make business decisions related to the manager's position, and that it was possible that Coastal would advertise for a Hardware Services Manager position." *Aff. of Kimberly Hock* ¶ 6. Hock ended the conversation by asking Peeples to keep her informed regarding his condition and status. *Id.* Peeples believes that this phone call from Hock constitutes harassment and evidences defendant's discriminatory intent to deprive him of his federal-

---

5. It should also be noted that, as discussed in text, defendant's notice of termination to Peeples included an account of the report from Hock to Harold Clasing that Peeples was "leaning toward" not returning as Hardware Services Manager. Peeples never disputed that statement, even though one would have expected such a manifest error, if it were an error, to have been corrected immediately by Peeples or someone on his behalf, e.g., his wife, who according to the medical records before the court, has been very supportive of Peeples throughout his ordeal.

ly-guaranteed rights, specifically, that Hock was "taking advantage of his state of mind." *Dep. of Peeples* at 43–46. Peeples apparently felt that Hock should have known of his delicate condition from the sound of his voice. *Id.* at 166. It is clear as a matter of undisputed fact, however, that Hock did not understand that Peeples was suffering from *major or clinical depression,* or any other mental or emotional disorder likely to put defendant on notice of the existence of a "serious medical condition," but rather, that she thought Peeples was unable to attend work due to a thyroid problem. *Def.'s* Ex. 20.

On March 31, 2000, the day after he spoke to Hock, Peeples e-mailed defendant's President, Bruce Clasing. *Def.'s* Ex. 21. This e-mail is central to several of the subsidiary issues in this case; accordingly, it is set forth verbatim:

Hi Bruce,

I'm writing you to find out if you plan to run an ad for the Service Manager position and if so where does that leave me as far as employment goes? I talked to Kim Hock yesterday and she didn't know. She also kept asking when I would be returning to work. I told her that I will be reevaluated on 4/12 and would update Coastal at that time. She also wanted to know if I felt that I would be able to return to the manager's position. I am unable to predict the future. I will know better after reevaluation by my doctor. I hope to fully recover and be able to perform any job.

*Like I told Kim I am out for an illness an [sic] do not want to lose my job because of illness and it is my understanding that I am protected by the A.D.A.*

This phone conversation with Kim was very stressful for me and I would prefer to communicate via email at present. Please reply as soon as possible.

Thanks, Gary.

*Id.* (emphasis added). Several critical facts are established as undisputed on the basis of this document authored by Peeples and the summary judgment record as a whole. First, it is clear that Peeples would not disclose the true nature and etiology of his ailment; to the contrary, he would, essentially, repeatedly limit his disclosures to defendant to the naked assertion that he was "out for an illness." *Id.; see also* Proposed Pretrial Order at ¶¶ 4, 5 (Stipulations by the parties that Peeples reported that he was "sick"). Second, it is clear that he was unwilling to discuss in a rational manner his prospective return to work, even though, according to Dr. de la Cruz, he needed only three weeks off (effective as of March 23, 2000), thus two more weeks from March 31, 2000, the date of the e-mail. Finally, it is clear that he wanted no contact at all from defendant while he was off work and was offended by any efforts to contact him, which he perceived as "constant interference." *Dep. of Peeples* at 26, 43–44.

Prior to Peeples's March 30, 2000, conversation with Hock and prior to the March 31, 2000, e-mail to Clasing set forth above, Ziskind had e-mailed Peeples, on March 27, 2000, asking whether he could do some work on-line from his home computer during his absence from work. *Def.'s* Ex. 22 (Ziskind's e-mails to Peeples, March 27, 2000). Having heard nothing from Peeples for an entire week, Ziskind sent a follow-up e-mail on Monday April 3, 2000. *Def.'s* Ex. 23 (Ziskind's e-mails to Peeples, April 3, 2000). Despite the fact that Peeples was a member of management, and notwithstanding the fact that Ziskind had been told that Peeples had "no restrictions" (as reported in the work excuse from the emergency room Ziskind received on March 13, 2000), Peeples considered these communications an inappro-

priate intrusion on his time away from work. *Dep. of Peeples* at 153–54. Peeples responded to Ziskind's April 3, 2000, e-mail by stating that, although he had attempted some of the on-line tasks suggested by Ziskind, he simply could not work from home. He reported that he had upcoming appointments with a "sleep specialist" and "thyroid specialist." *Def.'s* Ex. 24 (Peeples's e-mail to Ziskind). Peeples also reiterated that he would not know when he could return to work before he saw Dr. Braman on April 12, 2000. *Id.*

On Sunday, April 2, 2000, defendant had run a newspaper advertisement for the hardware manager position, just as Hock had contemplated might be done in her March 30, 2000, conversation with Peeples. Thus, in his response to Ziskind's April 3, 2000, e-mail, Peeples, having observed the advertisement in the Sunday paper, mentioned it to Ziskind and wrote: "Where does this leave me as far as employment goes?" *Id.* Ziskind replied (by return e-mail): "That's what we are trying to find out from you." *Id.* Peeples considered this response from Ziskind to be no response at all. *Dep. of Peeples* at 183. Peeples conceded in deposition, however, that he knew he could have returned to the manager's position even after the advertisement had been placed, *id.* at 182; in other words, it is undisputed in the record that defendant ran the newspaper advertisement as a reasonable prophylactic step in the event Peeples was not able to continue in the position. *Aff. of Kimberly Hock* ¶ 7.

Defendant's COO, Harold Clasing, was asked to respond to the e-mail inquiry from Peeples regarding his "employment status" and to reach some understanding of the reasons for Peeples's absence. *Aff. of Harold Clasing* ¶ 6. Additionally, because Peeples's e-mail to Bruce Clasing mentioned the ADA, defendant consulted legal counsel. *Id.* ¶ 7. After consulting

counsel, Harold Clasing decided that a conversation with Peeples's doctor might shed some light on the situation, assuming Peeples consented. *Id.* Abiding Peeples's request to communicate only by e-mail, Harold Clasing requested via e-mail a conference call with Peeples and Dr. Braman. *Def.'s* Ex. 26 (Harold Clasing's e-mail requesting a conference call, April 3, 2000). Remarkably, Peeples declined to be involved in a conference call, but he gave Harold Clasing permission to speak to Dr. Braman. *Dep. of Peeples* at 171.

Harold Clasing spoke to Dr. Braman on April 4, 2000. *Aff. of Harold Clasing* ¶ 8. According to Dr. Braman's notes, she told Harold Clasing that she had been seeing Peeples for "agitation, insomnia, anxiety and some [symptoms] of depression." *Def.'s* Ex. 16. Dr. Braman also told Clasing that Peeples's condition may be related to an underlying medical condition, his thyroid, and asked Harold Clasing not to contact Peeples again until after his next appointment on April 12, 2000. *Id.* According to Harold Clasing, when he asked Dr. Braman *"if there were any general or specific restrictions on Peeples's ability to work, . . . [s]he said that there were none, but that Peeples could not work at Coastal." Aff. of Harold Clasing* ¶ 8 (emphasis added). In her affidavit submitted by Peeples as an exhibit to his opposition memorandum, although Dr. Braman does not deny Harold Clasing's's version of this part of their conversation, she offers the following alternative restatement of that portion of the conversation:

> I *indicated* to Mr. Clasing that Mr. Peeples' condition did not present general or specific physical limitations, but I also *communicated* to him that Mr. Peeples' mental condition rendered him unable to work.

*Aff. of Randi Braman, D.O.* ¶ 9 (emphases added).[6] As a result of his discussion with Dr. Braman and, specifically, the instruction that he was not to contact Peeples, after again consulting legal counsel, Harold Clasing determined that Peeples had abandoned his job and that there was no likelihood of his returning to work at Coastal. *Id.* ¶¶ 9–10.

Defendant informed Peeples of his termination on April 5, 2000, by e-mail and by letter from Harold Clasing. *Def.'s* 27. Clasing stated:

> I have, with your permission, consulted your physician concerning your absence from work. She has concluded that, *while you have no general or specific restriction on your activities, you cannot perform your job with the Company. Moreover, you have stated to Kim Hock, that you are, leaning towards not seeing yourself returning to a management position at Coastal.*
>
> Because you cannot perform your job now, and there is no prognosis that you ever could return to the Service Manager job, we are removing you from the payroll effective immediately. You will receive, under separate cover, information concerning any COBRA or other benefits for which you are eligible. I

will also mail you a copy of this notice on Company letterhead.

> If you have any questions you can contact me via any means that you are comfortable with.

*Id.* (emphasis added). Neither Peeples nor anyone acting on his behalf ever contacted Harold Clasing. Peeples agreed on deposition that defendant's decision to end his employment was motivated by a sincere belief that he would not return to work at Coastal. *Dep. of Peeples* at 189.

On April 12, 2000, Peeples visited Dr. Braman. According to Dr. Braman, Peeples's anxiety and depression had worsened significantly since his last visit. *Aff. of Dr. Randi Braman* ¶ 10. According to her notes, in consequence of acute anxiety and depression, Peeples was incapacitated from performing any work until at least May 10, 2000. *Id.; Def.'s* Ex. 30 (Dr. Braman's Medical notes, April 12, 2000).

Peeples has submitted an affidavit executed by a Coastal service technician, Michael Stiegler. Stiegler attests that in April 2000, Swadesh Guchhait, Director of the Mid–Atlantic Region for Coastal, told Stiegler that Harold and Bruce Clasing had told Guchhait that the reason for Peeples's termination was that Peeples had

---

**6.** It is plain that Dr. Braman undertook to provide as little information to Clasing as she could, consistent with what apparently were her instructions from Peeples earlier on April 4, 2000. Her notes are revealing:

> *I discussed with patient what he wants me to disclose to [his] boss—he is okay with them knowing his condition* .... Mr. Clasing inappropriately tried to press me for details on who patient was to see and when. I asked him NOT to contact the patient for any further details, as he will not have any new information ... until patient sees me on April 12 .... *I expressed to Mr. Clasing that medical issues are private and personal and I feel he already has more information on Mr. Peeples than he really needs as an employer (he disagreed)* .... Mr. Peeples

feels he is being harassed by his workplace. I would have to agree there is more interference and persistence by his workplace than is acceptable. *[I] will give [a] copy of this note to patient (he requested it prior to my conversation with Mr. Clasing).*

*Def.'s* Ex. 16. These notes seriously undermine Dr. Braman's later assertion by affidavit that "Mr. Clasing did not mention ... [the ADA or the FMLA] during my conversation with him. If Mr. Clasing—or anyone for that matter—had informed me of any requirement that I provide certain information to Mr. Peeples's employer, I would have done so." *Pl.'s* Ex. 32, ¶ 9. To the contrary, it is clear that, absent Peeples's permission that she do so, Dr. Braman would have done no such thing.

sent them a threatening e-mail. *Aff. of Michael Stiegler* ¶ 4. Apparently, Peeples asserts that the e-mail in which he states his understanding that he is "protected by the A.D.A." is the "threatening e-mail" that is the subject of the Stiegler Affidavit. In any event, Guchhait denies that either Clasing told him that Peeples was fired for sending a threatening e-mail. *Aff. of Swadesh Guchhait* ¶ 3. Moreover, Harold Clasing and Hock deny that Peeples was terminated because he exercised any rights protected by the ADA or the FMLA. *Aff. of Harold Clasing* ¶ 13; *Aff. of Kimberly Hock* ¶ 9.

On April 25, 2000, Peeples filed a charge of disability discrimination with the Equal Employment Opportunity Commission ("EEOC"). *Def.'s* Ex. 28 (Charge of Discrimination Filed with EEOC). The Charge of Discrimination states:

> I have been employed with [Coastal] since April 24, 1995. I held the position of Service Manager. I have a disability and I am on medical leave. I have been subjected to harassment by my supervisor. On March 31, 2000, I complained about the harassment. On April 5, 2000, I was terminated from my position.
>
> The reason given for being terminated from my position was because my doctor could not release me soon enough.
>
> I believe I have been discriminated against due to my disability in violation of the American with Disabilities Act of 1990, as amended, with regards to harassment and discharge.

*Id.* Peeples also filed a complaint with the U.S. Department of Labor alleging that defendant failed to provide him with FMLA leave. *Dep. of Peeples* at 190–91.[7]

Peeples met with Dr. Braman on May 10, June 14, and August 1, 2000. *Def.'s* Ex. 30. On each occasion, she determined that Peeples could not be released to return to work of any sort. *Id.* Finally, on September 12, 2000, Dr. Braman certified that Peeples could return to work without restrictions effective on September 18, 2000. *Id.*[8]

---

7. Upon receiving notice of Peeples's complaint to the Department of Labor, defendant again consulted counsel. *Aff. of Harold Clasing* ¶ 11. In an effort to resolve the matter, and in consultation with the investigator from the Department of Labor, Harold Clasing authorized counsel to make Peeples an offer of reinstatement to a similar managerial position at the end of twelve weeks from the date of Peeples's absence that began on March 10, 2000. *Id.* ¶ 12. This notice was hand-delivered and e-mailed to Peeples on June 2, 2000. *Def.'s* Ex. 29 (Offer of Reinstatement, June 2, 2000). The letter stated, in part, that if Peeples was interested in returning to work for Coastal, then defendant would reinstate him in a management position equivalent to his former position. *Id.* The letter required that Peeples call Coastal's attorney by Monday, June 5, 2000, and produce medical evidence satisfactory to defendant that he could perform the duties of such a management position, "including the requirement that [he] put in whatever hours are necessary to perform the job." *Id.* Moreover, the job would commence on June 5, 2000 so [he] would have to be able to return on that date. *Id.*

Peeples did not respond to this offer. *Id.* at 192–94. Peeples did not respond to this letter because he received it on Friday, June 2, 2000, and he thought it would be "impossible" to follow the instructions in the letter by June 5, 2000. *Id.* at 192.

Remarkably, although consideration of this evidence seems clearly to be excluded by the plain language of Fed.R.Evid. 408 ("Compromises and Offers to Compromise"), and although plaintiff's counsel utterly fails to invoke the rule, I shall not consider this evidence for purposes of summary judgment.

8. Defendant contends that as Peeples was not sufficiently recovered to return to work after 12 weeks, any ostensible violation of the FMLA by defendant could not be deemed a legal cause of Peeples's termination of employment, i.e., Peeples would have been fired, or would have resigned, in any event. Peeples responds that this argument fails because his physicians have attested that his (allegedly

## III.

Count one of the Complaint asserts a claim for violation of the FMLA. In typical pleading fashion for such claims, the Complaint frames the violation of the FMLA in the following conclusory manner: defendant failed to "provide plaintiff with FMLA leave, terminated plaintiff because he required and/or took FMLA qualifying leave, interfered with, restrained, and denied the exercise of plaintiff's FMLA rights, and otherwise violated plaintiff's FMLA rights." *Complaint* ¶ 19. As more concretely framed in the summary judgment record, however, it is clear that the sole FMLA claim is the claim that Peeples was terminated because he took leave to which he was lawfully entitled under the FMLA. *Mem. of Pl. in Support of Mot. for Sum. J. and in Opp. to Def.'s Mot. for Sum. J.* at 13–20 (hereinafter *Pl.'s Opp.*); *see also* Proposed Pretrial Order at 1. Thus, the claim in count one is a wrongful discharge claim under FMLA.

Under the FMLA, "an eligible employee shall be entitled to a total of 12 workweeks of leave during any 12–month period ... [b]ecause of a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(D). An employee who takes such leave is entitled, on return from leave, "to be restored by the employer to the position of employment held by the employee when the leave commenced; or to be restored to an equivalent position with equivalent employment benefits, pay, and other terms and conditions of employment." *Id.* § 2614(a)(1)(A–B). An em-

ployer is prohibited from interfering with an employee's exercise of his or her FMLA rights. *Id.* § 2615(a)(1). Indisputably, if an employer terminates the employment of an employee for taking leave covered by the statute, there has been a violation.

Defendant argues that Peeples did not suffer from a "serious health condition." A "serious health condition" "means an illness, injury, impairment, or physical or mental condition that involves ... inpatient care in a hospital, hospice, or residential medical care facility; or *continuing treatment by a health care provider.*" 29 U.S.C. § 2611(11) (emphasis added). I presume, for purposes of the FMLA claim, that Peeples suffered from a "serious health condition," namely, clinical depression, *see Collins v. NTN–Bower Corp.*, 272 F.3d 1006, 1008 (7th Cir.2001) (noting that "clinical depression" "certainly" constitutes a "serious health condition"), for which he was under the "continuing treatment by a health care provider." Thus, if Peeples otherwise complied with the relevant statutory and regulatory requirements, his entitlement to the substantive protections of the FMLA seem beyond dispute.

■ Before an employer's duty to provide leave, restoration rights and other statutory benefits to employees under the FMLA is triggered, the employee must provide "adequate and timely" notice of the need for, duration and the justification for covered leave. *See Carter v. Ford Motor Co.*, 121 F.3d 1146, 1149 (8th Cir. 1997).[9] To this end, the FMLA presup-

premature) termination *exacerbated and prolonged* his clinical depression. As mentioned in text *infra,* I need not resolve this dispute because, as a consequence of Peeples's failure to provide defendant with adequate and timely notice of his need for FMLA leave, Peeples never triggered defendant's duties and obligations under the statute.

9. The Supreme Court recently noted that the FMLA regulations comprise

the administrative structure the Secretary [of Labor] devised pursuant to Congress' directive to issue regulations "necessary to carry out" the Act. 29 U.S.C. § 2654 (1994 ed.). The Secretary's judgment that a particular regulation fits within this statutory

poses that employers and employees will cooperate and exchange information. Where an unforeseen need for leave arises, as in the case *sub judice,* employers are to first obtain this information *"through informal means,"* and *"the employee or [employee's] spokesperson will be expected to provide more information when it can readily be accomplished as a practical matter, taking into consideration the exigencies of the situation." See* 29 C.F.R. § 825.303(b)(emphases added).[10] This obligation of the employee to provide adequate and timely notice of leave the need for which is unforeseen shall hereinafter be referred to as " § 303(b) notice."

Under the regulations, in contrast to the ability of an employer to enforce an employee's obligation to provide adequate and timely notice in respect to a *foreseeable* need for leave, enforcement of the requirement of notice in respect to an *unforeseeable* need for leave (i.e., § 303(b) notice) is *not* conditioned upon a showing that "the employee has actual notice of the FMLA notice requirements," 29 C.F.R. § 825.304(c)[11], through the employer's

posting of a notice of FMLA rights in the workplace. *See Satterfield v. Wal–Mart Stores, Inc.,* 135 F.3d 973, 983 (5th Cir. 1998); *Gay v. Gilman Paper Co.,* 125 F.3d 1432, 1436 n. 6 (11th Cir.1997). In any event, the undisputed facts of this case show that defendant's workplace was appropriately posted with advice as to FMLA rights.

The regulations do not specify the appropriate *content* of an adequate and timely § 303(b) notice, beyond the general requirement that the employer should proceed on an "informal" basis and the specific admonishment that *"the employee or [employee's] spokesperson will be expected to provide more information when it can readily be accomplished as a practical matter, taking into consideration the exigencies of the situation."* Nevertheless, the Seventh Circuit has recently held that the "substance and other particulars of [a § 303(b) notice] must conform to § 825.302 (relating to notice of a need for leave that is *foreseeable* ), and only the *timing* of its delivery is affected by

---

constraint must be given considerable weight.
*Ragsdale v. Wolverine World Wide, Inc.,* —— U.S. ——, 122 S.Ct. 1155, 1159–60, 152 L.Ed.2d 167 (2002).

10. The regulations relating to leave that is unforeseeable provide as follows, in pertinent part:

(b) The employee should provide notice to the employer either in person or by telephone, telegraph, facsimile ("fax") machine or other electronic means. Notice may be given by the employee's spokesperson (e.g., spouse, adult family member or other responsible party) if the employee is unable to do so personally. The employee need not expressly assert rights under the FMLA or even mention the FMLA, but may only state that leave is needed. *The employer will be expected to obtain any additional required information through informal means. The employee or spokesperson will be expected to provide more information when it can readi-*

*ly be accomplished as a practical matter, taking into consideration the exigencies of the situation.*
29 C.F.R. § 303(b) (emphasis added).

11. Section 825.304(c) provides as follows:

(c) In all cases, in order for the onset of an employee's FMLA leave to be delayed due to lack of required notice, it must be clear that the employee had actual notice of the FMLA notice requirements. This condition would be satisfied by the employer's proper posting of the required notice at the worksite where the employee is employed. Furthermore, the need for leave and the approximate date leave would be taken must have been clearly foreseeable to the employee 30 days in advance of the leave. For example, knowledge that an employee would receive a telephone call about the availability of a child for adoption at some unknown point in the future would not be sufficient.

§ 825.303." *Collins*, 272 F.3d at 1008 (citing *Satterfield v. Wal–Mart Stores, Inc.*, 135 F.3d 973 (5th Cir.1998)).[12]

*Collins* is instructive. There, the Seventh Circuit examined whether the plaintiff-employee complied with the requirement that she notify her employer of the need for FMLA leave. The court first assumed that the plaintiff's depression was *clinical* depression and thus constituted a "serious health condition." *Id.* at 1008. The court then determined that the plaintiff did not adequately notify her employer of her condition, which the court held is a critical FMLA requirement even for an emergency leave of absence. *Id.* (citing 29 C.F.R. § 825.303(b)). The employee had not stated that she was suffering from depression but only that she was "sick." *Id.* The court explained that a report that an employee is " 'sick' does not imply 'a serious health condition.' " *Id.* The court expounded:

> The regulation allows notice to be delayed a day or two (an emergency may interfere with giving notice as well as with working), but [the plaintiff] took much longer to let her employer know why she did not show up. Although workers need not expressly assert rights under the FMLA, *see* § 825.303(b)— firms should be able to figure out for themselves the legal rules governing leave, once they know that a serious medical condition or family situation is ongoing ...—*employers still are entitled to the sort of notice that will inform*

them not only that the FMLA may apply but also when a given employee will return to work . . . .

*Id.* (emphasis added).

In addition to an employer's entitlement, indeed, its duty, to obtain (informally) information concerning the need and justification for covered leave in response to an employee's satisfaction of his or her antecedent, reciprocal duty to provide an adequate and timely § 303(b) notice of the need for covered leave, an employer has the further right to obtain a formal "medical certification" under prescribed procedures. *See* 29 C.F.R. § 825.305. Significantly, although mere "posting" in the work site of a notice of FMLA rights will create a presumption that the employee had "actual notice" of his or her obligation to provide an adequate and timely § 303(b) notice (assuming, *contrary to the holding of Satterfield*, that posting is required at all), specific notice of the employer's desire for, and of the consequences of a failure timely to provide, a medical certification, is required before an employer may penalize an employee for failing to provide a medical certification. *Id.* at §§ 825.305, 825.306.

It is easy to see why an employer might not wish to resort to the medical certification procedure, particularly for a management level employee whose maturity and judgment might not be thought to require such verification. Thus, the availability of

---

12. 29 C.F.R. § 825.302 provides as follows, in pertinent part:

> (e) When planning medical treatment, the employee must consult with the employer and make a reasonable effort to schedule the leave so as not to disrupt unduly the employer's operations, subject to the approval of the health care provider. Employees are ordinarily expected to consult with their employers prior to the scheduling of treatment in order to work out a treat-

ment schedule which best suits the needs of both the employer and the employee.

No doubt the Seventh Circuit would agree that it would be unfaithful to the spirit of employer/employee cooperation which animates, in part, the regulations promulgated pursuant to the FMLA, to suggest that an adequate and timely § 303(b) notice might ignore the above provisions from § 825.302(e) calling for consultation. Peeples has utterly ignored this truism.

an *informal* mechanism to verify the legitimacy of FMLA leave is not a trivial matter. This is made clear by a consideration of the Department of Labor's prototype medical certification form, the WH–380. *See* 29 C.F.R. Pt. 825, App. A. Here are the substantive questions on the WH–380:

! Describe the medical facts which support your certification, including a brief statement as to how the medical facts meet the criteria of one of these categories.

! State the approximate date the condition commenced, and the probable duration of the condition (and also the probable duration of the patient's present incapacity if different).

! Will it be necessary for the employee to take work only intermittently or to work on a less than full schedule as a result of the condition (including for treatment described in Item 6 below)? If yes, give the probable duration.

! If additional treatments will be required for the condition, provide an estimate of the probable number of such treatments.

! If the patient will be absent from work or other daily activities because of treatment on an intermittent or part-time basis, also provide an estimate of the probable number and interval between such treatments, actual or estimated dates of treatment if known, and period required for recovery if any.

! If any of these treatments will be provided by another provider of health services (e.g., physical therapist), please state the nature of the treatments.

! If a regimen of continuing treatment by the patient is required under your supervision, provide a general description of such regimen (e.g., prescription drugs, physical therapy requiring special equipment).

! If medical leave is required for the employee's absence from work because of the employee's own condition (including absences due to pregnancy or a chronic condition), is the employee unable to perform work of any kind?

! If able to perform some work, is the employee unable to perform any one or more of the essential functions of the employee's job (the employee or the employer should supply you with information about the essential job functions)?

> If yes, please list the essential functions the employee is unable to perform.

! If neither [of the two scenarios immediately above] applies, is it necessary for the employee to be absent from work for treatment?

! If the patient will need care only intermittently or on a part-time basis, please indicate the probable duration of this need.

*See id.* at § 825.306.

As can be readily seen, it would redound to the benefit of both employer and employee (and certainly beleaguered health care professionals flooded with paperwork) to avoid resort to the formal certification process whenever it is possible to do so. No doubt, this consideration animates, in part, the admonishment in the regulations that *"the employer will be expected"* to proceed informally. 29 C.F.R. § 303(b).

In this case, Peeples contends that he provided an adequate and timely § 303(b) notice. Therefore, he contends, defendant's repeated efforts to obtain additional information were not justified. Peeples contends, explicitly, that if his crabbed, indeed, outright false, responses to Coastal's repeated efforts to obtain information from him frustrated Coastal, then Coastal's sole means of redress was to seek a formal medical certification and forgo the

continued resort to informal mechanisms. I disagree.

■ Based on the undisputed facts established in this record, viewed in the light most favorable to Peeples, it is clear as a matter of law that Peeples may not prevail on his FMLA claim because he failed to provide an adequate and timely § 303(b) notice.[13] Specifically, it is undisputed in this case, as the detailed factual account set forth above demonstrates, that despite repeated efforts by responsible officials of the defendant to obtain informally the information necessary to trigger defendant's duties under the FMLA, Peeples refused, without justification, to reveal any diagnosis or prognosis for his return, even though that information could be "readily accomplished as a practical matter," see 29 C.F.R. § 303(b), and could easily have been disclosed to defendant. Indeed, defendant was ultimately prohibited by Peeples's doctor even from communicating with Peeples. Under these circumstances, as a matter of law, defendant's termination of Peeples's employment did not violate the FMLA.

In contending that he provided adequate and timely § 303(b) notice, Peeples erroneously emphasizes that the March 10, 2000, discharge instructions and work excuse he received from Carroll County General Hospital were faxed to Ziskind. See Peeples's Opp. at 3. The document containing the discharge instructions contains information about Peeples's emergency room visit ("psychiatric consult") and the preliminary diagnosis he received there ("Depressive DO NOS"). Peeples's contention that the March 10, 2000, instructions and work excuse were faxed to Ziskind on March 13, 2000, id., is, manifestly, untrue. Rather, there is no evidence that Peeples ever provided the diagnosis made in the emergency room, and specifically the discharge instructions, to defendant before defendant conducted discovery in this lawsuit. That is, the record is clear that Peeples faxed to Ziskind on March 13, 2000, *only that portion of the emergency room document containing the work ex-*

---

**13.** Of course, I do not in any way belittle or diminish the debilitating and stigmatizing impact of clinical depression, an illness which, fortunately for its sufferers, has in recent years come "out of the closet," thus facilitating and making accessible, treatment to those who, for many years, suffered in silence. *See, e.g., Prozac, The Medication That Brought Depression Out of the Closet, Just Got Some Cheaper Competition*, MINNEAPOLIS-ST. PAUL STAR TRIB., Aug. 21, 2001, at 1E, 2001 WL 9635082. Indeed, in a larger sense, courts would do well to reflect the sensitivity displayed by the Third Circuit in the following passage from *Taylor v. Phoenixville School District*, 184 F.3d 296, 315 (3d Cir.1999):

Disabled employees, especially those with psychiatric disabilities, may have good reasons for not wanting to reveal unnecessarily every detail of their medical records because much of the information may be irrelevant to identifying and justifying accommodations, could be embarrassing, and might actually exacerbate workplace preju-

dice. An employer does not need to know the intimate details of a bipolar employee's marital life, for example, in order to identify or justify an accommodation such as a temporary transfer to a less demanding position.

Nevertheless, it is equally true that "an employer cannot be faulted [where] ... the employee fails to supply information that the employer needs ...." *Id.* at 315. In no sense of the term was the defendant here seeking to obtain "every detail" of Peeples's medical situation. To the contrary, all that was being sought was basic diagnosis and prognosis information. Accordingly, as discussed fully in text, whether or not the source of Peeples's depression was *work-related*, the simple fact is that defendant was entitled to have basic information about his diagnosis and prognosis for legitimate purposes under both the FMLA and the ADA. Peeples's unjustified failure to provide such information in the circumstances here fatally undermines his FMLA claim.

*cuse (stating that, as to "restrictions," he had "none," and that his return to work would be "determined by [his primary care physician]"). Peeples's Dep.* at 113; *see also Def.'s* Ex. 14; *Aff. of Ziskind* ¶ 6; *see supra* n. 4. Thus, as of the commencement of what would become an extended period of indeterminate and unexplained leave, on March 13, 2000, *Peeples provided his employer no information other than that he would perhaps provide more information after he had seen his physician.* It is absurd to suggest, let alone to believe, that this was adequate under federal law. *See Carter,* 121 F.3d at 1149; *see infra.* But the situation grew even more absurd in the ensuing weeks, when, as Peeples and his physicians gained greater information, their manifest hostility to sharing it with his employer grew even more resolute.

On March 13, 2000, Peeples had told defendant, i.e., Ziskind, that he "hoped" to return to work after seeing Dr. Braman on March 17, 2000. *Peeples's Dep.* at 113–14. On March 17, 2000, defendant received a note from Dr. Braman. The note states that Peeples "need[ed] follow-up appointments and medication adjustment," that Peeples was "not yet ready to resume work," and that Peeples could not return to work before a reevaluation on March 27, 2000. *Def.'s* Ex. 15. At this point, Peeples, an important member of the management team for his employer and the person in charge of the busiest department, had been out of work from the afternoon of Friday, March 10, 2000, through Friday, March 17, 2000, and this is the only information defendant had received from Peeples in respect to his need for leave. Peeples never disclosed the nature or etiology of his condition or the fact that he would be seeing a psychiatrist for evaluation. In fact, Peeples never disclosed that he was being treated by a psychiatrist for depression until he initiated this litigation; nei-

ther did Dr. Braman so advise the defendant.

On March 23, 2000, Dr. de la Cruz performed a psychiatric evaluation of Peeples. Dr. de la Cruz's notes reflect that he diagnosed Peeples with "a single episode" of "major depression" of "moderate severity" and he prepared a statement the very next day in which he recommended that Peeples should remain off work for "about two [to] three weeks." *Def.'s* Ex. 18. Peeples also began counseling at this time. *Def.'s* Ex. 16. It is undisputed that this evaluation, diagnosis, treatment regimen, and prognosis were not communicated to defendant; there was absolutely no good reason, nor indeed any rational reason, to withhold this information from Peeples's employer. Yet, over the next two weeks, while defendant (acting "informally" as authorized and encouraged by the FMLA regulations discussed *supra*) sought to learn the circumstances surrounding Peeples's absence from work and his prospects for returning, Peeples and Dr. Braman continued to say that they were unsure of the diagnosis and that they would not know more until he had additional "evaluations."

On March 27, 2000, defendant received another note from Dr. Braman. *Def.'s* Ex. 19. Dr. Braman did not share with defendant Dr. de la Cruz's diagnosis, nor did she project a return-to-work date. The note merely states that she had seen Peeples on March 27, 2000, and that he was not to return to work before his reevaluation on April 12, 2000. Inexplicably, no explanation was provided by Dr. Braman to the defendant, even though it seems perfectly clear that the April 12, 2000, prospective return-to-work-date was tied directly to Dr. de la Cruz's opinion that Peeples should take two or three weeks of sick leave. Three weeks from the date of

Dr. de la Cruz's March 23, 2000, examination and opinion is April 13, 2000.

The unjustified and, frankly, misguided scheme crafted by Peeples, in which Dr. Braman acquiesced, to withhold all substantive information from defendant, *see supra* n. 6, and the concomitant decision to provide only the utterly conclusory and worthless reports that "further evaluations" were needed, understandably prompted Hock, in her capacity as Director of Human Resources, to call Peeples on March 30, 2000, to continue the defendant's informal efforts to obtain more (and genuinely substantive) information as contemplated by the regulations implementing the FMLA. *See Aff. of Kimberly Hock* ¶ 5. In an extraordinary lack of understanding of what a mature member of management of a business enterprise should clearly appreciate, as well as a manifest lack of common sense, Peeples viewed his employer's desire to have a better understanding of the reason for his absence and his anticipated date of return as *harassment.* Thus, in keeping with his inexplicable scheme, Peeples did not tell Hock that he was diagnosed with depression and was (or soon would be) receiving treatment in the form of therapy and counseling.[14] Instead, he hinted to her that he

had an "overactive thyroid" and was to see an endocrinologist. *Def.'s* Ex. 30. However, his thyroid was fine, as Peeples had learned as early as March 18, 2000. Peeples also told Hock that, although he had no "restrictions" he could not perform work of any kind at Coastal. *Aff. of Kimberly Hock* ¶ 6. From Hock's perspective (and thus, from defendant's perspective), Peeples was essentially reporting that he needed some unknown quantum of time off, to permit some unknown medication to take effect to deal with some unknown condition. *Def.'s* Ex. 30. This hardly satisfied Peeples's duty to provide an adequate and timely § 303(b) notice.

On March 31, 2000, Peeples (motivated solely by a desire to look into whether his job, which he contends made him sick in the first instance, would be held for him, and not by any desire "to consult with [his] employer[ ] ... in order to work out a treatment schedule which [would] best suit[ ] the needs of both the employer and the employee," *see* 29 C.F.R. § 825.302(e)) e-mailed Bruce Clasing. *Def.'s* Ex. 21. Once again, it is undisputed that Peeples did not reveal Dr. de la Cruz's diagnosis or explain why he was absent from work. Peeples told Bruce Clasing that he would be reevaluated on April 12, 2000. He did

---

**14.** It seems that one can infer only a limited universe of possibilities as explanations for Peeples's inexplicable campaign of unjustified secrecy and overt misrepresentations to his employer. It seems he must have feared one or more of the following: (1) defendant would invoke its right to an independent medical evaluation, and that the selected psychiatrist would disagree with de la Cruz and/or Braman; (2) defendant would take an adverse employment action based on the contents of his medical records, e.g., his admitted use of marijuana during the course of his employment (potentially a violation of an employer's substance abuse policy); (3) defendant would take an adverse employment action based on defendant's knowledge of the actual nature of the impairment from which he suffered

(which of course would violate federal law); (4) the sheer embarrassment of any disclosure; and/or (5) the reality that his illness, as enabled by his physicians, caused a paralysis of his judgment. In any event, whatever his motivation might have been, neither singly nor in combination do any of these possibilities excuse Peeples's failure to provide adequate and timely notice, and Peeples has not even argued that any such basis could excuse his failure to provide timely and adequate notice. Rather, Peeples insists that he provided adequate and timely notice by providing the limited, conclusory (and ultimately false) information he provided. Dr. Braman seems to have a contradictory view of the matter. *See supra* n. 6.

not say for what reason, but he did say, without explanation and wholly gratuitously, that he was "protected by the ADA." Peeples also told Bruce Clasing that he was "unable to predict" whether he would be able to perform the manager's job. Finally, Peeples stated a preference to communicate by e-mail because he found his telephone conversation with Hock very stressful.

At this point, Peeples had been away from work for three weeks without a substantive (or honest) explanation for his absence. In continued pursuit of an informal attempt to obtain an explanation, Harold Clasing spoke with Dr. Braman after obtaining Peeples's consent. *Aff. of Harold Clasing* ¶ 8. In an extraordinary act of arrogance and disregard for his employer's legitimate interests, *Peeples declined to participate in the call and therefore abjured any opportunity to ensure that there was no miscommunication between his employer and his doctor.* Dr. Braman told Harold Clasing that she had been seeing Peeples since early March for "agitation, insomnia, anxiety and some symptoms of depression." *Def.'s* Ex. 16. According to Dr. Braman, there were no general or specific restrictions on Peeples's ability to work (she says "physical restrictions"), except that his mental condition made him "unable to work [at Coastal]." *Aff. of Harold Clasing* ¶ 8; *Aff. of Randi Braman, D.O.* ¶ 9. Dr. Braman did not tell Harold Clasing that Peeples was undergoing a course of treatment ordered by Dr. de la Cruz, nor did Dr. Braman tell Harold Clasing that Peeples could be expected to return to work two or three weeks from first seeing Dr. de la Cruz. *Def.'s* Exs. 2, 16. Furthermore, Dr. Braman did not relate to Harold Clasing, as she belatedly opines in her affidavit, that Peeples would be able to return to work with two or three weeks of *uninterrupted* time off. *Def.'s* Ex. 16. Rather, her own notes reflect that

Dr. Braman refused to answer additional questions and ordered that Coastal should not contact Peeples for any reason. *Id.*

Manifestly, during the period of March 10 through April 4, 2000, defendant was utterly incapable of making a preliminary determination as to whether Peeples's absence was justified, i.e., whether it was likely caused by a "serious health condition" and thus covered by the FMLA, because Peeples and his doctor were providing incomplete responses, *indeed, dishonest responses,* to defendant's informal requests for information. Most pointedly, in addition to all the other efforts catalogued in this record, Ziskind wrote, when Peeples asked about the status of his job in an April 3, 2000, e-mail, "That's what we are trying to find out from you." Not even this plaintive request, *made three weeks into the Peeples's unexpected and unexplained period of leave,* elicited a substantive response from Peeples. Not surprisingly, inasmuch as she was doing her patient's bidding, Dr. Braman's conversation with Harold Clasing the next day did nothing to cure the subsisting deficiency in disclosures. To the contrary, the reasonableness of Harold Clasing's interpretation of their conversation—that Peeples could not and almost certainly would not return to work at Coastal, coupled with Peeples's own view that Harold Clasing *sincerely believed* what he wrote in the letter of termination, i.e., that Peeples would not return to Coastal, *Dep. of Peeples* at 189, demonstrates that defendant permissibly acted on the information that Peeples and his doctor permitted it to have. Ultimately, defendant was forbidden to communicate with Peeples at all. *Def.'s* Ex. 16. In other words, having had its attempts to get an explanation for Peeples's absence (or any sort of answer regarding Peeples's ability to return

to his job) thwarted by Peeples and Dr. Braman, defendant not unreasonably determined, *in good faith after conferring with counsel,* that Peeples was not going to return to the manager's job and thus removed Peeples from the payroll effective April 5, 2000. *Cf.* 29 C.F.R. § 825.309(b) ("If an employee gives unequivocal notice of intent not to return to work, the employer's obligations under FMLA ... to restore the employee cease. However, the[ ] obligation[ ] continue[s] if an employee indicates he or she may be unable to return to work but expresses a continuing desire to do so.").

Thus, Peeples's reliance on *Wilson v. Lemington Home for the Aged,* 159 F.Supp.2d 186 (W.D.Pa.2001), in the face of his repeated equivocations, evasions, and misrepresentations, to contend that the sole lawful response available to defendant was to invoke the formal procedures provided for in the FMLA and its implementing regulations, including imposition of a requirement that Peeples produce a formal certification of his physician, coupled with formal notice of the consequences upon his failure to comply, is unavailing. Because Peeples never satisfied the threshold notice requirements the FMLA imposes upon employees who would exercise their rights under the statute, defendant's duties and obligations under FMLA were never triggered. Accordingly, defendant could not and did violate the statute.

The facts and circumstances of *Wilson* make it clearly distinguishable from this case. In *Wilson,* plaintiff was the acting director of nursing at a nursing home. 159 F.Supp.2d at 187. Her psychiatric health deteriorated precipitously in consequence of long hours of work necessitated by an employee strike at the facility. *Id.* at 187–88. Other managers and employees at the facility were fully aware of

plaintiff's precarious psychiatric condition because she had experienced uncontrolled crying and other symptoms in their presence at the workplace. *Id.* at 188. One manager in particular, Ms. Stevenson, who was in charge of admissions, medical records and marketing, had specific detailed knowledge of plaintiff's overwrought condition and she specifically spoke to the nursing home Administrator about how the Director of Nursing and the Executive Director of the nursing home, plaintiff's first and second tier supervisors, were treating plaintiff by overworking her "to the point of exhaustion" and how plaintiff was becoming "increasingly depressed and despondent." *Id.*

On December 11, 1997, plaintiff was diagnosed with clinical depression, prescribed Prozac and a counseling regimen, and she was ordered by her physician to remain off work until January 18, 1998. *Id.* Under the employer's rules, plaintiff had 15 days from December 11, 1997, i.e., until December 26, 1997, to submit a physician's certification. *Id.* No FMLA notices were available in the workplace and plaintiff was not specifically requested to submit a physician's certification (by the Director of Human Resources) until December 19, 1997. *Id.* Six days later, on Christmas Day 1997, plaintiff suffered a panic attack and a co-worker called 911. *Id.* As a result of plaintiff's debilitated condition, her co-workers, led by Ms. Stevenson, "began to look after plaintiff and organized the aid of other employees ... to assist her in cooking and bathing plaintiff." *Id.* at 188–89. *Id.*

Meanwhile, the nursing home terminated plaintiff by letter dated December 29, 1997, ostensibly because plaintiff had failed to submit her doctor's certification by the alleged deadline of December 26, 1997. Defendant terminated plaintiff even though plaintiff had advised the Director

of Human Resources on December 26, 1997, that her physician was out of the office until December 30, 1997, and promised that she would submit the certificate on December 30. *Id.*

Little more than a summary of the facts of *Wilson* is needed to demonstrate its inapplicability to the case *sub judice.* Indeed, it appears that virtually every member of the management team in the workplace was fully aware of the plaintiff's disabling mental breakdown; everyone clearly knew the extent and the cause of her condition, and they were involved in providing her with assistance in grooming and other activities of daily living. Moreover, in rejecting the defendant's argument that plaintiff had provided inadequate § 303(b) notice, the district judge in *Wilson* specifically cited the fact that the employer-defendant had requested a medical certification, thus undermining the defendant's suggestion that inadequate notice had been given. *Id.* at 192. ("If Plaintiff had not given enough information to Defendant to put it on notice, then it would not have had enough knowledge to ask for a medical certification in compliance with its own FMLA policy ...."). Rather than providing support for the view advanced by Peeples that defendant's sole option in the case at bar was to request a medical certification, the reasoning in *Wilson* supports the view that an employer is entitled to obtain from an employee in an informal manner information that could be "readily accomplished as a practical matter," *see* 29 C.F.R. § 303(b)—as provided for in the regulations—without penalty.

A more apt precedent is *Gay v. Gilman Paper Co.,* 125 F.3d 1432, 1436 (11th Cir. 1997). In *Gay,* the plaintiff had a nervous breakdown and her husband called to report that she was in the hospital. Rather than tell the employer the truth, the hus-band lied to the employer and reported that plaintiff was in the hospital for "tests." *Id.* at 1432. When the employer terminated her employment, plaintiff sued, *inter alia,* for violation of the FMLA.

The plaintiff's arguments echoed the very arguments Peeples advances in this case:

> Gay argues that her husband's assertion that she was in the hospital for tests was sufficient to put Gilman on notice that her condition was potentially FMLAqualifying, thus shifting the burden to Gilman to make further inquiry as to whether her absence in fact qualified for treatment under the FMLA. She also suggests that it was then Gilman's responsibility to avail itself of the means by which employers may obtain information verifying an employee's need for FMLA leave, such as asking Gay to furnish a detailed medical certification from her health care provider .... Finally, Gay argues that nothing in the FMLA or its corresponding regulations requires that an employer be given specific information about an eligible employee's "true condition or location."

*Id.* at 1434–35.

The court firmly rejected these arguments:

> *[I]n this case, not only was there a dearth of information provided, but the information that was provided was false.* Gay's husband informed her supervisor that Gay was having some tests run on the first day of her absence from work. When questioned by Gay's supervisor about his wife's condition, Gay's husband deliberately withheld information concerning the true nature of her condition and instructed his sons to do the same. *Under these circumstances, the burden to request further information never shifted to Gilman because Gilman could not reasonably be expect-*

*ed to conclude that Gay's absence might have qualified for treatment under the FMLA.*

The FMLA's notice requirements serve to assist employers in accommodating their employees' absences for certain medical or family reasons .... Of course, unforseen medical emergencies may make advance notice impossible, and in that case, no rights under the FMLA would be lost. *At the same time, an employer is entitled to expect that the employee will be cognizant of her own job responsibilities as well as the operations of the employer and will give notice as soon as practicable. When notice of a possible serious medical condition is deliberately withheld and false information is given, it cannot be said that an employee has been terminated in violation of the FMLA.*

*Id.* at 1436 (emphases added).

The Eighth Circuit was presented with a case similar in material respects to his case in *Carter v. Ford Motor Co.*, 121 F.3d 1146 (8th Cir.1997). In *Carter,* the defendant employer was informed by its employee that he was sick but the employee offered no other information beyond this conclusory assertion regarding his illness or when he would be able to return. *Carter,* 121 F.3d at 1148. Eventually, Carter's employment was terminated and he sued for, *inter alia,* violation of FMLA. In the course of discovery, it was learned that the employee had been working a second job while off work with Ford. The Eighth Circuit determined that the information provided to Ford was inadequate under the FMLA and thus affirmed the district court's grant of summary judgment in fa-vor the employer on the ground of inadequate and untimely notice. *Id.* Many cases have employed the reasoning illustrated in *Collins, Gay,* and *Carter* and accordingly have granted and/or sustained the entry of summary judgment in favor of a defendant-employer for violation by the plaintiff-employee of the FMLA's threshold notice requirement. *See, e.g., Hammon v. DHL Airways, Inc.,* 165 F.3d 441, 451 (6th Cir.1999); *Satterfield,* 135 F.3d at 976; *Wemmitt–Pauk v. The Beech Mountain Club,* 140 F.Supp.2d 571, 581 (W.D.N.C.2001); *Slaughter v. American Building Maintenance Co. of New York,* 64 F.Supp.2d 319, 325 (S.D.N.Y.1999).[15]

As explained at length above, Peeples never reported to defendant that he was suffering from major depression, although defendant attempted on numerous occasions to determine the nature of and the likely duration of his illness and when he would be able to return. Dr. Braman's mention to Harold Clasing that she had treated Peeples for "signs of depression," among other things, does not cure the problem created by the approach she and Peeples elected to pursue; it did not provide "timely and adequate" notice to defendant that Peeples was suffering from such clinical depression that it amounted to a "serious health condition."

As it is clear that Peeples did not provide defendant with the requisite notice of his condition and that he acted purposefully to thwart all of defendant's attempts to determine from what he was suffering, the severity of his condition, and when he would likely be able to return to work, summary judgment shall be granted on

---

**15.** Many of the cases applying the reasoning of *Collins, Gay,* and *Carter,* involve employees who take leave for the treatment of mental impairments such as clinical depression, panic attacks, and the like. Despite exhaustive research, no case could be found in which an employee suffering from such a condition was allowed to engage in the type of evasion and prevarication about his or her condition as is reflected in this record, and retain his rights under the FMLA.

the FMLA claim in favor of defendant. It is unnecessary, therefore, to discuss defendant's alternative argument that because Peeples was medically unable to return to work even after 12 weeks of leave, any violation of the FMLA was not the legal cause of his termination, or its "honest belief" defense. *See Medley v. Polk Co.,* 260 F.3d 1202, 1207 (10th Cir.2001).

### IV.

Peeples alleged in count two of the Complaint that defendant violated the ADA for a host of reasons, including failing to provide Peeples with reasonable accommodation, making inquiries prohibited by the ADA, "harassing" Peeples on the basis of his disability, failing to provide Peeples with leave to which he was entitled under the ADA, and terminating Peeples on the basis of his disability. *Complaint* ¶ 21. It appears from the summary judgment record that the gist of the ADA claims is that: (1) defendant discriminatorily denied Peeples leave, i.e., refused him a reasonable accommodation (by terminating his employment); and, alternatively, (2) terminated his employment in retaliation for Peeples's "invocation of his rights" under the ADA. *Pl.'s Opp.* at 1. For the following reasons, summary judgment shall be granted in favor of defendant on both of the ADA claims.

### A.

■ The prima facie case in a failure-to-accommodate case under the ADA requires the plaintiff to show "(1) that he was an individual who had a disability within the meaning of the statute; (2) that the employer had notice of his disability; (3) that with reasonable accommodation he could perform the essential functions of the position . . . ; and (4) that the [employer] refused to make such accommoda-

tions." *Rhoads v. Federal Deposit Ins. Corp.,* 257 F.3d 373, 387 n. 11 (4th Cir. 2001) (alterations in original) (internal quotation marks omitted) (quoting *Mitchell v. Washingtonville Cent. Sch. Dist.,* 190 F.3d 1, 6 (2d Cir.1999)), *cert. denied,* —— U.S. ——, 122 S.Ct. 1309, 152 L.Ed.2d 219 (2002).

■ "One is within the ADA's protected class if one is 'a qualified individual with a disability.'" *Haulbrook v. Michelin North America,* 252 F.3d 696, 702 (4th Cir.2001) (quoting 42 U.S.C. § 12112 (1995)). The question of whether a plaintiff is disabled under the ADA, "and therefore can bring a claim under the statute, is a question of law for the court, not a question of fact for the jury." *Rose v. Home Depot U.S.A., Inc.,* 186 F.Supp.2d 595 (D.Md.2002) (citing *Hooven–Lewis v. Caldera,* 249 F.3d 259, 268 (4th Cir.2001) (Rehabilitation Act case)). In the absence of proof of how an individual is substantially limited in performing a major life activity by his or her alleged impairment, and to what degree, it is appropriate to dismiss the claim as a matter of law. *Id.* (citing *EEOC v. Sara Lee Corp.,* 237 F.3d 349, 352–53 (4th Cir.2001)).

The ADA defines "disability" as a "(A) physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(2). Although Peeples's memorandum is not a model of clarity, it can only reasonably be read to assert that his claim falls under subsection (C), the "regarded as" disabled theory. *Pl.'s Opp.* at 20–25. Accordingly, Peeples is deemed to have conceded that he is not "disabled" under either subsection (A) or (B).[16]

---

**16.** Certainly, Peeples should not be criticized

for trying to hedge his bets, but his myriad

■ Drawing on Supreme Court guidance, the Fourth Circuit has explained that "[a]n individual is regarded as being disabled if he is regarded or perceived, albeit erroneously, as having an impairment that substantially limits one or more of his major life activities." *Haulbrook*, 252 F.3d at 703 (citing 42 U.S.C. § 12102(2) (1995)); *see Cline v. Wal–Mart Stores, Inc.*, 144 F.3d 294, 302 (4th Cir.1998). The Fourth Circuit elaborated as follows:

> One may be "regarded as" disabled under the ADA if "either (1) a covered entity mistakenly believes that [one] has a physical impairment that substantially limits one or more major life activities, or (2) a covered entity mistakenly believes that an actual, nonlimiting impairment substantially limits one or more major life activities." ... *The fact that an employer is aware of an employee's impairment without more, is "insufficient to demonstrate either that the employer regarded the employee as disabled or that [sic] perception caused the adverse employment action."*

*Haulbrook*, 252 F.3d at 703 (first alteration in original) (citations omitted) (emphasis added).[17] The Supreme Court has held

theories of liability are not easy to grasp or reconcile. On the one hand, he alleges that he had an actual disability, clinical or severe depression and anxiety, resulting from job stress during his brief tenure as Hardware Services Manager. On the other hand, the only issue he discusses in his memorandum is the "regarded as" theory of disability. In any event, as a matter of law, even assuming that Peeples's depression was a major or clinical depression, nevertheless, it clearly was a *temporary* condition, and his condition was thought to be temporary at all relevant times. Accordingly, Peeples's depression does not qualify as a "disability" under the actual impairment theory. *Pollard v. High's of Baltimore, Inc.*, 281 F.3d 462, 467–72 (4th Cir. 2002); *Rose v. Home Depot U.S.A., Inc.*, 186 F.Supp.2d 595, (D.Md.2002) ("The Fourth Circuit has ... explained that ' ... it is evident that the term "disability" does not include *temporary* medical conditions ..., even if those conditions require *extended leaves of absence* from work.' ") (citing *Halperin v. Abacus Tech. Corp.*, 128 F.3d 191, 199 (4th Cir. 1997)) (emphases added) (citations omitted); *see also* Pl.'s Ex. 32, ¶ 12 (*Aff. of Randi Braman, O.D.*)("During the course of my practice, many of my patients have shown symptoms of depression such as those shown by Mr. Peeples in March 2000, and these symptoms often include ... feelings that their job is overwhelming them and that they cannot do their jobs adequately. *Once these patients are treated with medication in a non-stressful environment, they typically return to work within several weeks and their feelings of inadequacy in their jobs dissipate. In other words, feelings of lack of self-worth—on the job or at*

*home—are a typical symptom of the type of depression which afflicted Mr. Peeples.*"). Apart from the irony that this passage makes Dr. Braman one of *defendant's* best witnesses on the ADA claim, it is particularly sad that Dr. Braman was not allowed simply to put this assessment in a report to defendant in March 2000 so as to avoid this entire dispute.

17. The *Haulbrook* Court cites favorably and quotes the Third Circuit's opinion in *Kelly v. Drexel Univ.*, 94 F.3d 102, 109 (3d Cir.1996), in concluding that "[t]he fact that an employer is aware of an employee's impairment, without more, is 'insufficient to demonstrate either that the employer regarded the employee as disabled or that [sic] perception caused the adverse employment action.' " *Haulbrook*, 252 F.3d at 703. The Third Circuit had reasoned, as follows:

> If we held otherwise, then by a parity of reasoning, a person in a group protected from adverse employment actions *i.e.*, anyone, could establish a *prima facie* discrimination case merely by demonstrating some adverse action against the individual and that the employer was aware that the employee's characteristic placed him or her in the group, e.g., race, age, or sex.

*Id.* This reasoning is fully applicable here. Peeples essentially argues that because he was fired, and because he was on sick leave (from some impairment the identity of which was unknown to his employer) at the time he was fired, he has established a prima facie case of discrimination under the ADA. This approach is deeply flawed, as discussed in text, and attempts to take the "bootstrapping"

that the requirement that an impairment "substantially limit" means that "impairments that interfere in only a minor may with the performance of a [major life activity]" are not covered. *Toyota Motor Mfg., Kentucky, Inc. v. Williams* 534 U.S. 184, ——, 122 S.Ct. 681, 691, 151 L.Ed.2d 615 (2002). Major life activities "refers to those activities that are of central importance to daily life." *Id.*

Again, although his memorandum is not as clear as one would like, it seems safe to assume that Peeples is claiming that defendant regarded him as disabled in the major life activity of working. As it has in other cases, in *Cline* the Fourth Circuit cited approvingly the EEOC's regulations [18] explicating the requirements of the ADA, including those which discuss the major life activity of working:

(I) The term *substantially limits* means significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes, as compared to the average person having comparable training, skills and abilities. The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working.

*Cline,* 144 F.3d at 302 (quoting 29 C.F.R. § 1630.2(j)(3)(I)). A class of jobs is defined as:

(B) The job from which the individual has been disqualified because of an impairment, and the number and types of jobs utilizing similar training, knowledge, skills or abilities, within that geographical area, from which the individual

is also disqualified because of the impairment . . . .

*Id.* at 302–03 (quoting 29 C.F.R. § 1630.2(j)(3)(ii)(B)) (alteration in original). Finally, a broad range of jobs in various classes is defined as:

(C) The job from which the individual has been disqualified because of an impairment, and the number of types of other jobs *not* utilizing similar training, knowledge, skills or abilities, within that geographical area, from which the individual is also disqualified because of the impairment . . . .

*Id.* at 303 (quoting 29 C.F.R. § 1630.2(j)(3)(ii)(C)) (alteration in original)(emphasis added).

In *Ross v. Campbell Soup Co.,* 237 F.3d 701, 709 (6th Cir.2001), the Sixth Circuit noted the particularly heavy burden a plaintiff proceeding on a "regarded as" theory of disability faces:

Proving that an employee is regarded as disabled in the major life activity of working takes a plaintiff to the farthest reaches of the ADA. It is a question embedded almost entirely in the employer's subjective state of mind. Thus, proving the case becomes extraordinarily difficult. Not only must a plaintiff demonstrate that an employer thought he was disabled, he must also show that the employer thought that his disability would prevent him from performing a broad class of jobs. As it is safe to assume employers do not regularly consider the panoply of other jobs their

---

condemned in *Haulbrook,* 252 F.3d at 704, to a new height.

**18.** The Supreme Court has recently reiterated that the "EEOC interpretive guidelines are not controlling upon the courts by reason of their authority. . . . Nevertheless, where consistent with ADA, they do not constitute a body of experience and informed judgment to

which courts and litigants may properly resort for guidance." *Toyota Motor Mfg., Kentucky, Inc. v. Williams,* 534 U.S. 184, ——, 122 S.Ct. 681, 689, 151 L.Ed.2d 615 (2002) (citations omitted) (internal quotation marks omitted). Neither party has questioned their reasonableness here.

employees could perform, and certainly do not often create direct evidence of such considerations, the plaintiff's task becomes even more difficult. Yet the drafters of the ADA and its subsequent interpretive regulations clearly intended that plaintiffs who are mistakenly regarded as being unable to work have a cause of action under the statute. Whether Ross is such a plaintiff lies in the question of whether Campbell Soup Co. regarded him as substantially limited from performing a broad class of jobs. In cases such as this one, where there is substantial evidence that an individual's medical status played a significant role in an employer's decision to fire that individual, combined with evidence that the employer concocted a pretextual justification for that firing, the need for more extensive factual inquiry into whether the employer engaged in unlawful discrimination is especially acute.

*Id.* The material, undisputed facts of this case make plain the accuracy of these observations.

Peeples argues that the present case is akin to *Cline v. Wal–Mart Stores, Inc.,* *supra,* in which the Fourth Circuit upheld a jury verdict in favor of plaintiff on a "regarded as" disabled theory. I disagree. In *Cline,* the plaintiff was employed by the defendant as a night maintenance supervisor until he was demoted to the position of night maintenance worker following his return from a medical leave of absence for surgery made necessary by the reoccurrence of a brain tumor. *Cline,* 144 F.3d at 298. The plaintiff (and his wife) complained about his demotion and indicated that legal action might be pursued. Thereafter, he and another employee "clocked in" early for a staff meeting and, ostensibly, both were soon fired "for allegedly 'stealing time' from the company."*Id.* Nevertheless, there was substantial evidence that the termination of the co-employee's employment was plainly a ruse to disguise the adverse action taken against Cline. Indeed, the co-employee was subsequently rehired and appointed as a supervisor. *Id.*

The plaintiff sued defendant alleging violations of the FMLA and the ADA. *Id.* A jury found defendant liable on the FMLA retaliation claim and the ADA demotion claim. *Id.* Following the entry of judgment, defendant moved for judgment notwithstanding the verdict ("JNOV") or a new trial, which the district court denied. The defendant appealed, claiming, in part, that the district court improperly denied its motion for JNOV or a new trial on the plaintiff's ADA claims. *Id.* The Fourth Circuit affirmed in substantial part. *Id.*

The Fourth Circuit explained, in respect to the plaintiff's "regarded as" theory of liability, that as there was a jury trial "the sole issue facing this Court is whether, when viewed in light of the appropriate standard of review, the jury's finding of intentional discrimination is supportable." *Id.* at 303. The Court determined that the finding was supportable as there was direct evidence (from plaintiff's wife's account of her conversation with a store manager and from the person who had been hired to replace plaintiff as maintenance supervisor) that the defendant demoted plaintiff because the appointing authority within Wal–Mart perceived him as disabled. This evidence included statements by other supervisors that the plaintiff was demoted because of his health and that he lacked the "mental capacity" to handle the supervisor job. *Id.* at 303, 304.

The Court then held, consistent with the reasoning of the Sixth Circuit in *Ross,* that a plaintiff must demonstrate that the employer regarded the employee "as handicapped in his or her ability to work by

finding the employee's impairment to foreclose *generally the type of employment involved*," and that the plaintiff's field of employment was maintenance supervisory work. *Id.* at 303 (internal quotation marks omitted) (quoting *Forrisi v. Bowen*, 794 F.2d 931, 935 (4th Cir.1986)). The Court concluded that the jury had an adequate evidentiary basis for concluding that the defendant regarded the plaintiff "as being substantially limited in his ability to perform a class of supervisory jobs" and thus was unable to handle supervisory tasks. *Id.* at 304.

■ Peeples's reliance on *Cline* is unavailing, as the facts in that case are far removed from the circumstances presented here. Peeples argues broadly that the evidence in this case shows that defendant perceived Peeples "as forever unable to perform supervisory work." *Peeples's Opp.* at 23. Peeples's rhetoric is wholly divorced from the undisputed facts in the record, however, as the contrary is true. There is no evidence whatsoever that any responsible official of defendant believed that Peeples was unable to handle *any and all* supervisory positions in the information technology industry, or even all the supervisory positions at Coastal. Indeed, there is not even substantial evidence in this record that defendant believed that Peeples could not perform the Hardware Services Manager job; rather, *the record shows that defendant believed that Peeples believed he could not do the job.* This conclusion is amply supported by the circumstantial evidence permeating this record, as well as the direct evidence provided by Harold Clasing and Hock, both of whom have testified that they did not perceive Peeples as impaired from performing his job. *Aff. of Harold Clasing* ¶ 13; *Aff. of Hock* ¶ 8. There is not a scintilla of evidence to rebut that testimony.

Peeples's situation is actually closely analogous to that of the plaintiff in *Haulbrook*. There, the plaintiff appealed the district court's grant of summary judgment rejecting his disparate treatment and retaliation claims under the ADA. *Haulbrook*, 252 F.3d at 698. In support of his disparate treatment claim, the plaintiff argued that the defendant regarded him as disabled. *Id.* at 703. The district court concluded, and the Fourth Circuit agreed, that the facts established that defendant "did not know the extent of [the plaintiff's] illness" and had "sought further information regarding the nature of his impairment." *Id.* The Court reasoned that a finding that the defendant regarded the plaintiff as disabled "fl[ies] in the face of common sense" given the defendant's strenuous efforts to secure medical information on the plaintiff that would permit defendant to return plaintiff to an appropriate employment setting.

The Court explained that "one is not substantially limited in the major life activity of working unless one is barred from generally obtaining employment of a given type, as opposed to being barred from a specific job," *id.* at 703–04 (citing *Gupton v. Virginia*, 14 F.3d 203, 205 (4th Cir.), *cert. denied*, 513 U.S. 810, 115 S.Ct. 59, 130 L.Ed.2d 17 (1994)), and that the defendant believed the plaintiff could perform his job but that it was necessary for the plaintiff to be placed in a different building due to his illness. *Id.* at 704. As in *Haulbrook*, this case involves a plaintiff whose own lack of diligence (and concomitant evasiveness) regarding discussions about his medical condition, and the interrelated issue of whether and when he would return to work, is the direct and sole causative factor in the termination of his employment.[19] Revealingly, the Fourth Circuit noted:

19. The *Haulbrook* Court reasoned as follows:

Had Haulbrook exercised reasonable dili-

[The employer] did what an employer committed to meeting its ADA responsibilities in good faith would do: It sought to open a dialogue with [the plaintiff] and obtain further, accurate information regarding his condition so that it could craft an appropriate accommodation. *[The defendant's] attitude towards [the plaintiff] deteriorated only after he repeatedly and pointedly refused to speak to his superiors regarding his condition.*

*Id.* (emphasis added).

As explained at length *supra,* Coastal similarly attempted, on numerous occasions, to determine what was wrong with Peeples, how it could aid and/or accommodate Peeples, and when, if at all, Peeples (or his physicians) thought he could return to work. Indeed, Peeples's supervisor, Ziskind, assigned him work while he was at home. If Ziskind regarded Peeples as disabled and therefore unable to perform his job as a manager, he surely would not have asked him to do the work. *Cf. Sanders v. FMAS Corp.,* 180 F.Supp.2d 698, 705 (D.Md.2001) (noting that the defendant employer scheduled plaintiff employee for remedial training after plaintiff's asthma attacks (her "disability") and thus, like the defendant in *Haulbrook,* the defendant believed the plaintiff could continue to per-form her job (citing *Haulbrook,* 252 F.3d at 704)).

It is thus clear in the present case that defendant's perception of Peeples eroded only after Peeples "repeatedly and pointedly refused to speak to his superiors regarding his condition." As the Fourth Circuit explained:

[The plaintiff] engages in an impermissible quantity of bootstrapping by failing to cooperate with his employer's attempt to determine the scope and nature of his disability, then pleading the employer's interest in determining whether and to what extent he might be disabled as a "suspicion" of disability, and finally asserting that he satisfies the regarded-as prong of the disability definition.

*Id.* at 704. As it is undisputed on this record that defendant did not "perceive" Peeples as substantially impaired from the performance of a "class of jobs" or a "broad range of jobs in various classes," *see Cline,* 144 F.3d at 302–03, Peeples is not "disabled" under the "regarded as" prong of the ADA definition of "disability."

To find otherwise would allow Peeples to use the ADA as a sword rather than its intended use as a shield. *Haulbrook,* 252 F.3d at 705 ("The ADA is a shield against discrimination on the basis of disability; it is not a sword enabling employees who are

gence in determining the results of his methacholine challenge test and engaged in a reasonable dialogue with [his employer], [the employer] would have known that as of October 10 (a month and a half prior to his termination) Haulbrook's physician determined that he did not have reactive airways disease and could return to work with no medical restrictions. Any misperception on [the employer's] part after October 10 is therefore directly chargeable to Haulbrook's improper conduct and may not form the basis for an ADA "regarded-as" claim. 252 F.3d at 704–05.

Similarly here, Peeples's failure to communicate in a timely and meaningful way with Coastal about his medical circumstances fore-closes the contention that any "misperception" about his ability to return to work may be ascribed to defendant. In essence, Peeples refused to engage, in good faith, in the "interactive process" with his employer which the ADA not only contemplates but unambiguously mandates. *See generally Nichols v. Harford County Bd. of Educ.,* 189 F.Supp.2d 325, 337–39 (D.Md.2002); *see id.* at 338 (observing that "[a]cting in good faith involves both sides communicating directly exchanging essential information 'and neither side can delay or obstruct the process' ") (quoting *Barnett v. U.S. Air, Inc.,* 228 F.3d 1105, 1115 (9th Cir. 2000) (en banc), *vacated and remanded on other grounds,* —— U.S. ——, 122 S.Ct. 1516, —— L.Ed.2d —— (2002)).

not, in fact, substantially limited in any major life activity to refuse reasonable requests by their superiors for information and then plead their superiors' resulting lack of information as a 'regarded-as' disability."). A simple paraphrase of the Fourth Circuit's observations in *Haulbrook* fully describes this case:

> We are cognizant of the ADA's important purpose in protecting individuals who are regarded as disabled from discriminatory treatment in employment. The ADA, however, does not abrogate the general duty of an employee to respond to direct and reasonable requests of his employer for information and cooperation regarding a potentially disabling condition. The record in this case establishes that [Peeples's] complete refusal to cooperate with [Coastal's] good-faith efforts to determine the nature of his possible disability and craft any necessary accommodations was the cause of his termination.

*Haulbrook*, 252 F.3d at 707. To put the matter slightly differently, in the words of the Sixth Circuit, this most assuredly is not a case "where there is substantial evidence that an individual's medical status played a significant role in an employer's decision to fire that individual, combined with evidence that the employer concocted a pretextual justification for that firing." *Ross*, 237 F.3d at 709. Accordingly, the failure-to-accommodate claim under the ADA fails as a matter of law and summary judgment shall be entered as to that claim in favor of defendant.

### B.

Peeples also wishes to pursue an ADA retaliation claim based on the theory that he was retaliated against for mentioning the ADA in his March 30, 2000, e-mail to Bruce Clasing, *Dep. of Peeples* at 32, and devotes a large portion of his brief to the ADA retaliation claim. *Peeples's Opp.* at 26–32.[20] Defendant contends that the ADA retaliation claim is not properly before the court because it was not included in Peeples's EEOC charge. *Mem. of Points and Authorities in Support of Def.'s Mot. for Summ. J.* at 22 (citing *Rohan v. Networks Presentation LLC,* 175 F.Supp.2d 806, 809–10 (D.Md.2001); *Evans v. Tech. Applications & Serv. Co.,* 80 F.3d 954, 963 (4th Cir.1996)).

█ I must reject defendant's contention, however, because Peeples's EEOC intake questionnaire clearly implies a charge of retaliation. *Pl.'s* Ex. 36. Even more fundamentally, however, the fact that Peeples's termination followed a period of leave (which was his desired "reasonable accommodation") and, indeed, occurred while he was actually on leave, compels the conclusion that, although "retaliation" is not mentioned specifically in his EEOC charge, a possible retaliation violation would surely be encompassed within an investigation conducted by a reasonable investigator assigned to handle the EEOC charge actually filed by Peeples. *See Talbot v. U.S. Foodservice, Inc.,* 191 F.Supp.2d 637, 637–40 (D.Md.2002) ("In determining what claims have been administratively exhausted, the litigant is not limited to the 'precise wording' of his formal EEOC charge of discrimination, but may litigate 'all claims of discrimination uncovered in a reasonable EEOC investigation of that charge.'") (citing *Hubbard v. Rubbermaid, Inc.,* 436 F.Supp. 1184,

---

**20.** Apparently, Peeples would also assert a retaliation claim in respect to the FMLA. He has not briefed that issue, however, and I consider it abandoned. In any event, it is difficult to see on the facts here any analytical difference between the substantive, wrongful discharge claim under FMLA, on the one hand, and an ostensible "retaliation" claim under the FMLA, on the other hand.

1189 (D.Md.1977); *Chisholm v. United States Postal Serv.*, 665 F.2d 482, 491 (4th Cir.1981); *King v. Seaboard Coast Line R.R. Co.*, 538 F.2d 581, 583 (4th Cir.1976)).

██ ` A retaliation claim "does not require that the claimant be disabled. Rather, the ADA provides that 'no person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing.'" *Rhoads,* 257 F.3d at 391 (quoting 42 U.S.C. § 12203(a)). Thus, even if Peeples is not disabled (or regarded as disabled), he may still seek damages if defendant terminated his employment because he engaged in protected activity.

██ In proving such a claim, the Fourth Circuit has instructed that:

> [A]n employee may utilize ordinary principles of proof using any direct or indirect evidence relevant to and sufficiently probative of the issue.... To avoid summary judgment the plaintiff must produce direct evidence of a stated purpose to discriminate and/or [indirect] evidence of sufficient probative force to reflect a genuine issue of material fact.... What is required is evidence of conduct or statements that both reflect directly the alleged discriminatory attitude and that bear directly on the contested employment decision.

*Id.* (citations omitted) (internal quotation marks omitted) (third alteration in original). Alternatively, to establish a prima facie case of retaliation under the burden shifting method, a plaintiff must prove that "(1) she engaged in a protected activity; (2) the employer took an adverse employment action against her; and (3) a causal connection existed between the protected activity and the asserted adverse action." *Von Gunten v. Maryland,* 243 F.3d 858,

863 (4th Cir.2001) (citing *Beall v. Abbott Labs.,* 130 F.3d 614, 619 (4th Cir.1997)). Once the plaintiff has established a prima facie case, the defendant has the burden of producing evidence of a legitimate nondiscriminatory reason for the adverse action. *Munday v. Waste Mgmt. of N. America, Inc.,* 126 F.3d 239, 242 (4th Cir.1997) (citing *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Ross v. Communications Satellite Corp.,* 759 F.2d 355, 365 (4th Cir.1985)), *cert. denied,* 522 U.S. 1116, 118 S.Ct. 1053, 140 L.Ed.2d 116 (1998). If the defendant raises a genuine issue of fact, then the plaintiff bears the burden of proving retaliation by demonstrating that the employer's reason is pretextual. *Id.* (citing *Carter v. Ball,* 33 F.3d 450, 459 (4th Cir.1994)); *Obi v. Anne Arundel County,* 142 F.Supp.2d 655, 672 (D.Md.2001), *aff'd,* 28 Fed.Appx. 333 (4th Cir.2002).

Peeples theorizes that when he sent his March 31, 2000, e-mail to Bruce Clasing, in which he mentions that it was his "understanding" that he was protected by the ADA, *Def.'s* Ex. 21, he engaged in protected activity under the ADA because in sending the e-mail he was "invoking his ADA rights." *See Peeples's Opp.* at 26–32. As mentioned above, the ADA prohibits adverse employment actions against a person because such person has "opposed any act or practice made unlawful by [the ADA] or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing."

██ It is clear on the face of the statutory language that Peeples's e-mail does not fall within any of the protected activity set forth in the ADA. Plainly, Peeples was not *participating* in any proceeding; *at most, he was simply notifying his employer of his intention to oppose any possible*

*or potential attempt to violate his right to be free of disability discrimination should any such attempt be made.* To be sure, in a proper setting the use of informal letters or other communications impliedly or explicitly charging discrimination, i.e., "opposing a practice," may qualify as engaging in protected activity. *See, e.g., Abramson v. William Paterson College,* 260 F.3d 265, 287 (3d Cir.2001) ("informal" letters of complaint from college professor to Provost relating to religious discrimination sufficient); *Settle v. Baltimore County,* 34 F.Supp.2d 969, 1007 (D.Md.1999) (police officers expressing concerns over disparate treatment on the basis of race at a meeting with supervisors treated as protected activity), *aff'd without op.,* 203 F.3d 822 (4th Cir.2000).

These cases, however, are not remotely similar to this case. As a matter of law, sending a highly informal e-mail to a company's president which mentions in passing that the employee believes that he is "protected by the ADA" does not amount to a protected activity, particularly as it is clear from the e-mail that Peeples was not at that time charging or claiming that defendant was then or was about to violate the ADA. Nor could a reasonable person reasonably believe under the circumstances shown on this record that such a violation was occurring or was about to occur. *See Glover v. South Carolina Law Enforcement Div.,* 170 F.3d 411, 415 (4th Cir.1999)("the scope of protection for activity falling under the participation clause is broader than for activity falling under the opposition clause" of the anti-retaliation prohibitions contained in Title VII (internal quotations and citations omitted)), *cert. dismissed,* 528 U.S. 1146, 120 S.Ct. 1005,

145 L.Ed.2d 1065 (2000); *Hoffman v. Lincoln Life and Annuity Distributors, Inc.,* 174 F.Supp.2d 367, 377 (D.Md.2001)("Of course, an employee is protected from retaliation even if she is not the victim of discrimination in fact; that is, it is not necessary that she oppose behavior that actually constitutes a Title VII violation . . . rather, the test is whether she reasonably believed the behavior she opposes [violates the statute] ") (citations omitted); *Fitch v. Solipsys Corp.,* 94 F.Supp.2d 670, 678 (D.Md.2000) (same).

Indeed, contrary to Peeples's contention, *see Peeples's Opp.* at 27, this e-mail does not even pass muster as an *invocation* of his ADA rights. *Cf. Billings v. Taylor Royall, Inc.,* 2000 WL 490734, *6 (D.Md. Apr. 11, 2000) (observing that merely forming a group known as "Performers With Disabilities" did not constitute an invocation of rights under the ADA). This is especially true inasmuch as the record shows, as a matter of law, that Peeples obstinately refused to engage in the interactive process critical to the proper functioning of the ADA (and critical to a proper invocation of the employee's rights under the ADA). An employee's gratuitous announcement to his employer that he is aware of statutory protections under federal anti-discrimination statutes is no more probative of discriminatory or retaliatory animus than an employer's knowledge that its employee is a member of a protected class. *Cf. Haulbrook,* 252 F.3d at 707. To conclude otherwise would leave the door open so that any off-hand remarks made by employees to their employers regarding the ADA could amount to engaging in protected activity.[21] This

---

**21.** Closely related to the contention that sending the e-mail was protected activity is Peeples's argument that the Stiegler Affidavit contains direct evidence of retaliation. In the affidavit, Stiegler attests that he was told that

Peeples was fired because he sent "a threatening e-mail." However, the probative value of this double hearsay, even if it is deemed an "admission" by defendant under Fed.R.Evid. 801(d)(4), is de minimis in that the alleged

would denigrate the high importance of the ADA in a most unfortunate manner.

■ In any event, even if Peeples's e-mail equated to a protected activity, it is clear as a matter of law that defendant did not terminate Peeples's employment because of this remark in an e-mail. That is, the legitimate non-retaliatory reason for Peeples's termination is abundantly transparent; it was defendant's belief, based on Harold Clasings's elliptical discussion with Dr. Braman and Peeples's truncated conversations with Ziskind and Hock, together with his equivocal and evasive e-mails, all as informed by his repeated unwillingness to cooperate with defendant in discussing any possible accommodation, that Peeples could not and did not want to return to his job at Coastal. Prior to Peeples's termination, Ziskind, Hock, and Harold Clasing, on numerous occasions, attempted to determine for what reason Peeples was unable to come to work and in what way they could help him and he could help them cover his important responsibilities. For instance, Ziskind, on March 27, 2000, responded to Peeples's e-mail by writing that they were attempting to determine from Peeples what do to about his employment. It also appears, though he may have never stated flatly that he no longer wanted the managerial position, that he related to Hock that it was *possible* that he no longer wanted to be a manager.[22] *Aff. of Hock* ¶ 6. Further, Peeples attempted to communicate with defendant as little as possible by refusing to communicate by telephone or in person and would only correspond via e-mail. *Def.'s* Ex. 21. Harold Clasing, hoping to determine Peeples's employment status and to gain an understanding regarding his condition, contacted Dr. Braman with Peeples's consent. What Harold Clasing gleaned from his conversation with Dr. Braman was that Peeples would be unable to continue to work for Coastal. *Def.'s* Ex. 27; *Aff. of*

---

declarant, Guchhait, denies under oath that he made this statement to Stiegler, and the Clasings deny that they made any such statement to Guchhait. At all events, the Stiegler Affidavit amounts, at most, to a *scintilla* of direct evidence of a retaliatory motive that does not suffice to create a material dispute of fact for the purposes of summary judgment; the record, taken as a whole, could not lead a rational trier of fact to find for Peeples, the non-moving party on this issue. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (explaining that judgment as a matter of law is proper if "there can be but one reasonable conclusion as to the verdict."). Morever, even if I were to deem the Stiegler Affidavit sufficient to establish a prima facie case of retaliation on a "shifting burdens" theory, which I do not, for the reasons discussed in text, Peeples has not projected sufficient evidence to permit a rational jury to conclude that the non-retaliatory reason given by defendant for Peeples's termination is pretextual. In other words, if a jury were to rely on this "evidence" from Stiegler to find in favor of Peeples, its verdict would be wholly irrational and I would not allow it to stand. *Cf. Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 148, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) ("[A]n employer would be entitled to a judgment as a matter of law if the record *conclusively* revealed some other, non-discriminatory reason for the employer's decision, or if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was *abundant and uncontroverted* independent evidence that no discrimination had occurred.")(emphasis added).

22. Peeples claims in his affidavit that he "never stated that he had any second thoughts about the Manager position." *Peeples's Aff.* ¶ 19. Yet, during his deposition, he stated that he told Hock that he was "leaning toward not to return as the manager." *Peeples's Dep.* at 163. It is clear that a party cannot create a dispute of fact, or create his own alleged undisputed facts for that matter, by contradicting his sworn deposition testimony. *See Barwick v. Celotex Corporation*, 736 F.2d 946, 960 (4th Cir.1984); *Rohrbough v. Wyeth Lab., Inc.*, 916 F.2d 970, 975 (4th Cir.1990).

*Harold Clasing* ¶¶ 9–10. It was defendant's belief, though according to Peeples, it was a belief that was both incorrect and sincerely-held, that Peeples had abandoned his job. It must be remembered, as well, that Peeples was specifically advised in the letter terminating his employment that he had stated to Hock that he was "leaning toward" not returning. Peeples's continued silence in the face of this disclosure constitutes abundant independent evidence that it was true. Accordingly, summary judgment shall be granted in favor of defendant as to the retaliation claim.

### V.

For the reasons set forth herein, the motion for recusal shall be denied and summary judgment shall be entered in favor of defendant as to all claims. An order follows.

### ORDER

In accordance with the foregoing Memorandum, it is this 23rd day of May, 2002, by the United States District Court for the District of Maryland, ORDERED

(1) That the plaintiff's motions for summary judgment and for recusal are DENIED; and it is further ORDERED

(2) That defendant's motion for summary judgment is granted and JUDGMENT IS ENTERED IN FAVOR OF DEFENDANT AGAINST PLAINTIFF; and it is further ORDERED

(3) That the Clerk shall CLOSE THIS CASE and TRANSMIT copies of this Order and the foregoing Memorandum to the attorneys of record.